**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 22-Cr-684 (JLR) |
| | ) | |
| [1] BEVELYN WILLIAMS | ) | |
| [2] EDMEE CHAVANNES | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT**

CHRISTOPHER WRIGHT, ESQ.
Law Office of Christopher Wright
299 Broadway
Suite 708
New York, New York 10007

*Attorney for Bevelyn Williams*

AARON MYSLIWIEC, ESQ.
Miedel & Mysliwiec, LLP
80 Broad Street, Suite 1900
New York, New York 10004

*Attorney for Edmee Chavannes*

## Introduction

This Memorandum of Law is submitted on behalf of Defendants Bevelyn Williams ("Williams") and Edmee Chavannes ("Chavannes") in support of their Motion to Dismiss the Indictment, pursuant to Rule 12 of the Federal Rules of Criminal Procedure. Defendants submit that dismissal of the Indictment is warranted on each of the following grounds:

I.      **THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT HAS ENGAGED IN SELECTIVE PROSECUTION**

II.     **FACE WAS ENACTED FOR THE PURPOSE OF PROTECTING THE PREVIOUSLY RECOGNIZED RIGHT TO ABORTION; AFTER *DOBBS*, THERE IS NO FEDERAL RIGHT TO ABORTION; THEREFORE, FACE IS UNCONSTITUTIONAL**

III.    **THE FACE ACT IS UNCONSTITUTIONAL CONTENT-BASED REGULATION OF SPEECH**

IV.    **THE GOVERNMENT'S INDICTMENT ALSO VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT AND THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT**

V.     **AFTER *DOBBS*, FACE EXCEEDS CONGRESS' POWER UNDER THE COMMERCE CLAUSE, AND NO FEDERAL CIVIL RIGHTS INTEREST CAN SUPPORT FACE'S CONSTITUTIONALITY[1]**

Defendants Williams and Chavannes move pursuant to Rule 12(b)(3)(A)(iv) to dismiss the instant indictment because the government has engaged in selective and vindicative prosecution of the defendants for the content of their protected expressions making this case an unconstitutional application of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248(a) ("FACE"). Defendants further contend FACE is an unconstitutional content-based regulation of protected

---

[1] Defense Counsel have researched and reviewed motions to dismiss in several other recent and current FACE prosecutions, including: *United States v. Houck*, 22-cr-323 (GJP) (E.D. Pa.); *United States v. Gallagher, et al.*, 22-cr-327 (M.D. Tenn.); and *United States v. Handy, et al.*, 22-cr-96 (CKK) (D.C.). In each of those cases, similar motions to dismiss were filed and denied, though obviously those denials are not binding on this Court. After reviewing those motions and consulting with Stephen M. Crampton, Esq. of the Thomas More Society defense counsel advances the same or similar arguments in this case as arguments in those cases.

speech; and as applied FACE violates the Religious Freedom Restoration Act 42 U.S.C. § 2000bb ("RFRA") and the Free Exercise Clause of the First Amendment.  Finally, Williams and Chavannes assert that FACE is an invalid exercise of Congress' authority under the Commerce Clause.

The defense is aware that the Second Circuit has previously resolved many of the issues presented in the instant motion to dismiss, but we submit recent case law has made the issues presented more complex and fluid.  As discussed in more detail below, we respectfully ask the Court to consider the changing landscape of FACE case law as it applies to Second Circuit precedent.

Particularly instructive is a lengthy order issued by Judge Ammon of the Eastern District of New York where the Court denied a preliminary injunction sought by the New York State Attorney General against pro-life activists for alleged violations of FACE.  *New York ex rel. Underwood v. Griepp*, No. 17-CV-3706, 2018 WL 3518527 (E.D.N.Y. July 20, 2018), *aff'd, People v. Griepp*, 11 F.4th 174 (2nd Cir. 2021).  Albeit in the context of a civil proceeding, the *Griepp* district court decision thoughtfully and exhaustively grappled with many of the same issues presented in this case.  After taking extensive evidence and hearing argument, the *Griepp* court denied the Attorney General's motion for a preliminary injunction.  The district court explicitly relied on Second Circuit case law on FACE and concluded that the Attorney General had failed to meet its burden, thereby rebuffing its request for an injunction against pro-life activists due to their alleged violations of FACE.  The district court's decision in *Griepp* graphically illustrates the multifaceted constitutional challenges presented in FACE prosecutions.

**Factual Allegations**

The Indictment was filed December 13, 2022 and charges three Counts. Count One charges

Williams and Chavannes with Conspiracy to Violate Freedom of Access to Clinic Entrances.

*Indictment*, Count One, *citing* 18 U.S.C. § 248(a)(1) and (b)(2), and 18 U.S.C. § 371.  Count Two

and Count Three charges Williams and Chavannes, respectively, with Violating Freedom of

Access to Clinic Entrances ("FACE").  *Id.*, Count Two and Count Three, *citing* 18 U.S.C. §

248(a)(1), (b)(2), and 2.

FACE's prohibited activities include that:

> [w]hoever – (1) by force or threat of force or by physical obstruction,
> intentionally injures, intimidates or interferes with or attempts to
> injure, intimidate or interfere with any person because that person is
> or has been, or in order to intimidate such person or any other person
> or any class of persons from, obtaining or providing reproductive
> health services . . . shall be subject to [criminal penalties].

18 U.S.C. § 248(a).

Count One of the Indictment provides the government's overview of the alleged

Conspiracy. The Indictment alleges, among other things, that:

- Williams and Chavannes are founders of At the Well Ministries, Inc., a non-profit organization started in 2014. Williams and Chavannes, individually and at times through At the Well Ministries, Inc., have allegedly sought to prevent lawful abortions from occurring throughout the country (*Indictment* at ¶ 1);

- Allegedly from at least in or about 2019 through at least 2022, Williams and Chavannes repeatedly agreed to and did use unlawful means – including force, threats of force, and physical obstruction – to injure, intimidate, and interfere with individuals seeking to obtain lawful reproductive health services and individuals providing such services (*Id.* at ¶ 2);

- Including from 2019-2021, Williams and Chavannes regularly protested in front of a Manhattan health care center ("Health Center") that administered abortions and other reproductive care (*Id.* at ¶ 3);

- Williams and Chavannes publicized an event at the Manhattan Health Center to take place on June 19, 2020 and June 20, 2020, which the defendants attended and allegedly threatened Health Center staff, allegedly blocked the entrance to the Health Center and Williams is alleged to have assaulted a Health Center volunteer (*Id.* at ¶ 4);

4

- After the June 2020 event Williams and Chavannes allegedly engaged in similar behavior at abortion clinics in Fort Myers, Florida; Nashville, Tennesse; Atlanta, Georgia; and Brooklyn, New York (*Id*. at ¶ 5).

## **Argument**

## I.     THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT HAS ENGAGED IN SELECTIVE PROSECUTION

### *A.     The Applicable Legal Standard for Selective Prosecution Motions*

In the Second Circuit, a defendant who advances a claim of selective prosecution must do so in pretrial proceedings. *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983), *cert denied*, 466 U.S. 971 (1984) (citation omitted); *see also* Fed. R. Crim. P. 12(b)(3)(A)(iv). In *United States v. Wayte*, 470 U.S. 598 (1985), the Supreme Court set forth the standards controlling the determination whether there has been a selective prosecution. "[A]lthough prosecutorial discretion is broad, it is not 'unfettered. Selectivity in the enforcement of criminal laws is … subject to constitutional constraints.'" *Wayte*, 470 U.S. at 608, *quoting United States v. Batchelder*, 442 U.S. 114, 125 (1979).  Under *Wayte*, a claim of selective prosecution requires proof of discriminatory effect and discriminatory intent. 470 U.S. at 608.

In *Wayte*, the defendant had refused to register for the draft. He was prosecuted under a "passive enforcement" governmental policy that targeted those who self-identified themselves as draft refusers in communication with the government. *Id.* at 600. The Court held that this policy did not violate equal protection of the laws of the First Amendment.

Rather, the Court explained:

> [i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards. Under our prior cases, these standards require petitioner to show both that the passive enforcement system had a discriminatory effect and that it was motivated by a

> discriminatory purpose. All petitioner has shown here is that those eventually prosecuted, along with many not prosecuted, reported themselves as having violated the law. He has not shown that the enforcement policy selected nonregistrants for prosecution on the basis of their speech.

*Id.* at 608-09 (internal citations omitted).

In *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992), the Second Circuit explained that in order to support a defense of selective prosecution, the defendant must make at least a *prima facie* showing both:

> '(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [the defendant], he has been singled out for prosecution, and (2) that the government's discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'

*Fares*, 978 F.2d at 59, *quoting Moon*, 718 F.2d at 1229 (citation omitted). Conduct may be regulated as long as it is not regulated because of a person's viewpoint. In the present case, however, viewpoint discrimination is the reason for the prosecution of Williams and Chavannes.

### B.    Selective Enforcement for Viewpoint Discrimination Is Constitutionally Prohibited

The enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To be sure, the Attorney General and United States Attorneys have broad discretion to enforce criminal laws, and they "have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. Const., Art. II, § 3 and citing 28 U.S.C. §§ 516, 547). Notwithstanding such broad latitude, a "prosecutor's discretion is 'subject to constitutional constraints.'" *Id.* (quoting *Batchelder*, 442 U.S. at 125 (1979)). One of these constraints is that a

prosecution "may not be based on an unjustifiable standard "such as race, religion, or other arbitrary classification." *Id. See also* Fed. R. Crim. P. 12(b)(3)(A)(iv) (selective or vindictive prosecution is ground for pre-trial dismissal). Neither may the Government act be based on its "disapproval of a subset of messages it finds offensive," as "[t]his is the essence of viewpoint discrimination." *Matal v. Tam*, 582 U.S. 218, 248 (Kennedy, J., concurring in part).

Viewpoint discriminatory prosecutions are "an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Buzzetti v. City of New York*, 140 F.3d 134, 139-40 (2d Cir. 1998) (quoting *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). "The government discriminates against viewpoints when it disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Wandering Dago, Inc. v. Destito,* 879 F.3d 20, 31 (2d Cir. 2018) (quoting *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510).

## C.    *The Government's Procedural Improprieties Demonstrate Selective Enforcement.*

In the instant case, Williams and Chavannes readily satisfy the requirement of showing similarly situated individuals not being prosecuted. First, the FACE Act prohibits not only interference with an individual's seeking or providing reproductive health services, but also the intentional damaging of a facility providing reproductive health services or a place of religious worship. 18 U.S.C. § 248(a)(3).  Pregnancy resource centers constitute facilities providing reproductive health services under the Act. *Id*.  The FACE Act as written "does not play favorites," thus "pro-choice" protestors and "pro-life" protestors come within the coverage of the statute. *United States v. Weslin*, 156 F.3d 292, 297 (2nd Cir. 1998) ("It applies to those who would interfere with the provision of counseling at a clinic in which patients are encouraged not to have abortions.")  The statute criminalizes the "obstruction of reproductive health clinics regardless of the issue that animates the demonstrators" and "[i]t contains no requirement whatsoever that the

offenders intend to communicate a particular message—or any message at all—by their obstructive actions." *Id.* at 296.

The Government has not prosecuted almost any of the more than 170 purported incidents of violence against pro-life pregnancy centers and churches nationwide in the wake of the leak and publishing of *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022).[2]  According to FBI Director Christopher Wray's testimony before Congress, since the Supreme Court's *Dobbs* decision, the DOJ has indicted only two pro- abortion activists out of at least 81 estimated attacks against pro-live groups (not including churches).[3]  All the while, the DOJ has engaged in a course of aggressively using FACE along with other federal statutes to prosecute peaceful acts of speech and alleged acts of nonviolent civil disobedience by persons advocating a pro-life and anti-abortion positions, while simultaneously turning a blind eye to brazen and repeated violent attacks on churches and pregnancy resource centers committed by pro-abortion activists.  In a DOJ Report entitled, "Recent Cases on Violence Against Reproductive Health Care Providers," DOJ's own reporting shows that DOJ has initiated thirteen criminal prosecutions against pro-life defendants since 2020, and only one criminal prosecution against pro-abortion defendants.[4]  Furthermore, previous  to  the *Dobbs* decision in June 2022 the only FACE prosecutions the Government filed involved violent or threatening activity. *See* DOJ Recent Cases. While the conduct of Williams and Chavannes are accused of may have caused slight discomfort or annoyed Health Care facility employees.  Yet the two defendants face harsher penalties than that faced by almost all of the defendants in the cases filed before *Dobbs*, even though some of them involved bomb threats,

---

[2] Mary Margaret Olohan, "DOJ's Kristen Clarke: A Pro-Abortion Activist Enforcing the Law Against Pro-Lifers," The Daily Signal,       Oct. 26, 2022, https://www.dailysignal.com/2022/10/26/dojs-kristen-clarke-pro-abortion-activist-enforcing-law- pro-lifers/; *see* Fed. R. Evid. 201(b)(2) (courts may take judicial notice of facts that are "not subject to reasonable dispute" because they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned") (hereafter "Olohan").

[3] https://www.foxnews.com/politics/pro-life-centers-targeted-70-abortion-related-violent-threats-dobbs-decision-fbi.

[4] Hereinafter "DOJ Recent Cases" accessible at https://www.justice.gov/crt/recent-cases- violence-against-reproductive-health-care-providers.

threats of physical violence, firebombing of abortion facilities, and shootings. *Id.*

The Government's practice of prosecuting pro-life conduct while favoring pro-abortion conduct (by not prosecuting) is not content-neutral. It is the epitome of a content-based selective enforcement based on viewpoint discrimination. Accordingly, the Government's refusal to apply FACE to pro-abortion activists like Jane's Revenge[5], while simultaneously and aggressively applying it to pro-life individuals like Williams and Chavannes who were apparently targeted by the Government in retaliation for the *Dobbs* decision — as well as some fifteen others in 2022 and another eight so far this year[6] — is unconstitutionally selective and viewpoint discriminatory.

Not coincidentally, the attacks on pregnancy resource centers since the Supreme Court's decision in *Dobbs* on June 24, 2022, corresponds with the Administration's formalizing the formation of the Reproductive Rights Task Force less than three weeks later, on July 12, 2022, with the express purpose of continuing its efforts to "identify ways to protect access to reproductive health care in anticipation of the possibility of the Supreme Court overturning *Roe v. Wade* and *Planned Parenthood v. Casey*." DOJ Press Release dated July 12, 2022, "Justice Department Announces Reproductive Rights Task Force," https://www.justice.gov/opa/pr/justice-department-announces-reproductive-rights-task-force.

The press release further stated that the Justice Department was "working with external stakeholders such as reproductive services providers" – that is, coordinating with abortion facilities

---

[5] Luke Vander Ploeg and Addison Lathers, "Anti-Abortion Group in Wisconsin Is Hit by Arson, Authorities Say," *New York Times*, May 8, 2022, https://www.nytimes.com/2022/05/08/us/madison-anti-abortion-center-vandalized.html; Alice Reid, "Report: Group claims credit for Madison anti-abortion office attack, warns of more," NBC 26, May 11, 2022, https://www.nbc26.com/news/state/report-group-claims-credit-for-madison-anti-abortion-office-attack-warns-of-more; Judith Levine, "Beyond Revenge, What Does Jane's Revenge Want?," Intercept, June 16, 2022, https://theintercept.com/2022/06/16/janes-revenge-abortion-rights/ (Jane's Revenge claiming responsibility for acts of vandalism and fire-bombings of pro-life clinics and offices).

[6] Olohan, *supra*; *see also* Inside Edition Staff, "8 People Indicted for Blocking Michigan Reproductive Health Services Facility That Provides Abortions: DOJ," Inside Edition, February 23, 2023, https://www.insideedition.com/8-people-indicted-for-blocking-michigan-reproductive-health-services-facility-that-provides-79945.

– and would "identify such actions and coordinate appropriate federal government responses, including proactive and defensive legal action where appropriate." *Id*. In short, the Government admits that it has singled out individuals like Williams and Chavannes for "proactive legal action" due solely to their opposition to abortion, even though some of the events giving rise to the instant prosecution in this case occurred well over two years before the Indictment.

Despite the numerous and ongoing incidents of violent actions against pregnancy resource centers, no task force protecting pro-life facilities has been formed; virtually no prosecutions have been commenced; and, upon information and belief, almost no serious investigation has been undertaken, even though the fire bombings and vandalism of pregnancy resource centers are prohibited by the very same law under which Williams and Chavannes are being prosecuted.

**D.      *The Government's Pattern of Enforcement Against Only Pro-Life Individuals, and Not Pro-Abortion Individuals, Violates the First Amendment***

The First Amendment prohibits "viewpoint discriminatory enforcement" where the Government has engaged in "a pattern of unlawful favoritism." *Brown v. City of Pittsburgh*, 586 F.3d 263, 293 (3d Cir. 2009) (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002)); *see also Gaughan v. City of Cleveland, Ohio*, No. 1:05-CV-180, 2005 WL 3216269, at *13 (N.D. Ohio Nov. 29, 2005), aff'd sub nom. *Gaughan v. City of Cleveland*, 212 F. App'x 405 (6th Cir. 2007) (analyzing both selective enforcement and viewpoint discriminatory enforcement claims). An as-applied challenge requires the Court to determine whether the statute as applied to the facts of the case violates the First Amendment. *Singer v. United States,* 38 F.3d 1216 (6th Cir. 1994). To prevail, a defendant must show that "enforcement of the [law] has tended to fall more heavily on those who advocate one viewpoint (e.g., a pro-life view) than on those who advocate another (e.g., a pro-choice view)," and an "intent to discriminate on the basis of viewpoint." *Brown*, 586 F.3d at 293. In other words, the defendant prevails where "a pattern of enforcement activity *evinc[es]* . . .

intentional discrimination on the basis of viewpoint." *Brown*, 586 F.3d at 294 (emphasis added).

There is overwhelming evidence of exactly this sort of pattern here. As noted, FACE protects both pro-choice and pro-life "reproductive health services." Yet the indisputable evidence shows that the Department of Justice has engaged in a pattern of aggressive enforcement of FACE against nonviolent pro-life individuals who have been federally indicted for conduct that occurred years before the *Dobbs* decision – the timing of these prosecutions underscores the viewpoint discrimination perpetrated by the Government. Simultaneously, the Government has turned a blind eye to blatant and violent violations by pro-abortion individuals—even when pregnancy centers and churches have been *firebombed* and vandalized at far greater rates in the past year, expressly because they promote abortion alternatives.[7]

In 2022 alone, the Government engaged in seven enforcements of the FACE Act against a total of 26 individuals—all of whom are pro-life activists.[8] This number is significantly higher than FACE prosecutions in recent years, which included only four individuals in 2021, one in 2020, two in 2019, one in 2018, and nine total between 2011 and 2017.[9] Glaringly, the Government has thus far enforced FACE against only six individuals for the ongoing attacks against no less than *98 Catholic churches* and *81 pregnancy resource centers* just since the May 2022 leak of the draft opinion in *Dobbs*.[10] This attack, and *more than one hundred seventy like it* around the country since May 2022, plainly violate the express terms of FACE. *See Riely*, 860 F. Supp. at 702. Yet the Government has prosecuted only two of these outrageous acts of violence to date. As one pro-abortion writer objecting to the use of the FACE Act to prosecute anyone other than pro-life

---

[7] Molly Davis and Kirsten Fiscus, "Molotov cocktail thrown through window at Nashville pregnancy resource center Thursday," The Tennessean, June 30,2022, https://www.tennessean.com/story/news/crime/2022/06/30/nashville-pregnancy-centermolotov- cocktail-breaks-window-janes-revenge-abortion/7780855001/.

[8] Olohan, *supra* n.1; See also DOJ Recent Cases.

[9] DOJ, Recent Cases, *supra.*

[10] Olohan, *supra* n.1; *see also* Catholic Vote, *Tracking Attacks on Pregnancy Centers & Pro-Life Groups*, last updated Dec. 2, 2022, https://catholicvote.org/pregnancy-center-attack-tracker/; Catholic Vote, *Tracker: Over 240 Attacks on U.S. Catholic Churches Since May 2020*, https://catholicvote.org/tracker-church-attacks/.

advocates observed, FACE "was not written in response to acts like" those against pregnancy resource centers that formed the basis of indictment, and "[i]n its 30 years on the books, it has been used sparingly. Until recently, the roughly 100 cases filed were all against people who" were pro-life.[11]  Indeed. there is on average more than one attack on churches or  pro-life groups *every other day* for the past nine months, yet the DOJ has largely ignored them and concentrated instead on non-violent incidents that occurred almost two years ago involving pro-life advocates.

In short, this is precisely the kind of "pattern of unlawful favoritism" that "evince[es] . . . intentional discrimination on the basis of viewpoint." *Brown*, 586 F.3d at 293-94; *see also Thomas v. Chi. Park Dist*., 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers . . . would of course be unconstitutional."). Beyond question, the Government's recent enforcement of the FACE Act has fallen far "more heavily on those who advocate . . . a pro-life view," even though the indisputable evidence confirms that "advocates of a [pro-life] viewpoint" do *not* "happen to engage in certain proscribed conduct more than those who espouse other views." *Id.*  If anything, the evidence shows that those with a pro-abortion viewpoint engage in ostensible FACE Act violations far more often than do those with a pro-life viewpoint. This easily "evinces" both disparate impact *and* intentional discrimination in violation of the First Amendment. It is also easily distinguished from cases where defendants or claimants pointed to no actual "evidence that the police turned a blind eye toward pro-abortion speech while not turning a blind eye to possible transgressions by plaintiffs." *McGuire*, 386 F.3d at 65.

This evidence also fits well within the *Village of Arlington Heights* factors that courts often find "probative in determining discriminatory intent." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,

---

[11] Natasha Lennard, "Reproductive Rights Activists Charged Under Law Intended to Protect Abortion Clinics," The Intercept, February 3, 2023, https://theintercept.com/2023/02/03/abortion-clinics-face-act/.

429 U.S. 252, 266-68 (1977)). Specifically, it shows a "consistent pattern" that "disparately impact[s] members of a particular class of persons," as well as "significant departures from normal procedures." *Id.* Indeed, one former high-ranking DOJ official recently stated (anonymously) that the prosecution of pro-life advocates like Williams and Chavannes here are "atypical" from previously FACE Act prosecutions, which usually "involve things like blowing up an abortion clinic, or threatening to blow up a clinic, serious violence or threats to bodily injury."[12]

Finally, on July 8, 2022, as part of an overall response to *Dobbs*, President Biden declared that "I'm asking the Justice Department . . . to do . . . everything in their power to protect these women seeking to invoke their right" to abortion; and "[i]n states where clinics are still open, to protect them from intimidation."[13] These sorts of "contemporaneous statements" by relevant decisionmakers like President Biden, especially while failing to take any official action in response to the phenomenon of nationwide and rampant pro-abortion violence against pregnancy centers and churches since the *Dobbs* leak, are only more evidence of discriminatory intent. It is also noteworthy that after *Dobbs* there is no federal "right" to abortion, while the First Amendment rights of free speech, free exercise of religion, and freedom of assembly – which should protect Defendants -- remain as viable as ever.

To be clear, the Second Circuit has previously held that it "is irrelevant whether, in practice, most of those prosecuted under FACE are anti-abortion protestors," because "First Amendment law does not recognize disparate impact claims." *Weslin,* 156 F.3d at 297. The defendants submit that the *Weslin* holding is relevant only in the context of a First Amendment challenge and *not* the

---

[12] Olohan, *supra* n.1.
[13] Remarks by President Biden on Protecting Access to Reproductive Health Care Services, July 8, 2022, https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/08/remarks-by-president-biden-on-protecting-access-to-reproductive-health-care-services/#:~:text=I'm%20asking%20the%20Justice,to%20protect%20them%20from%20intimidation.

instant selective prosecution challenge. *See*, *United States v. Dinwiddle*, 76 F.3d 913, 923 (8th Cir. 1996) ("[t]there is no disparate-impact theory in First Amendment law.").

The Indictment against Williams and Chavannes should be dismissed for selective prosecution.

**II.      FACE WAS ENACTED FOR THE PURPOSE OF PROTECTING THE PREVIOUSLY RECOGNIZED RIGHT TO ABORTION; AFTER  *DOBBS*, THERE IS NO FEDERAL RIGHT TO ABORTION; THEREFORE, FACE IS UNCONSTITUTIONAL**

FACE was originally enacted for the purpose of protecting abortion and access to abortion. The findings supporting the need for the Act and the entire legislative history were thus focused on abortion. When the Supreme Court handed down its decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (June 24, 2022), the constitutional "right" to abortion ceased to exist, and the very reason for FACE, its essence, its foundation, was destroyed. As a result, FACE is unconstitutional.

*A.   The legislative history proves that FACE was enacted only to protect abortion.*

As introduced in 1993, FACE was explicit in its purpose of protecting abortion and abortion alone; indeed the act was explicitly introduced in response to the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), which held that pro-life activists could not be held liable under 42 U.S.C. § 1985(3), the civil counterpart to 18 U.S.C. § 241, for their actions in trespassing and obstructing access to abortion facilities. In *Bray*, the plaintiff abortion facilities had originally succeeded in obtaining a permanent injunction against Operation Rescue and certain individuals for "conspiring to deprive women seeking abortions of their right to interstate travel" and enjoining them "from trespassing on, or obstructing access to, abortion clinics in specified Virginia counties and cities in the Washington, D.C., metropolitan area." 506 U.S. at 267.

In Section 2 of the FACE bill, Statement of Findings and Purpose, for example, it recited

findings that "facilities **offering abortion services** have been targeted in recent years" and the drafters of the bill sought to "prohibit the obstruction of access by women **abortion services**." Senate Bill 636 -- Freedom of Access to Clinic Entrances Act of 1994, 103rd Congress (1993-1994), https://www.congress.gov/bill/103rd-congress/senate-bill/636/text/is?r=29.

As reported out of the Senate Committee on Labor and Human Resources on July 29, 1993, the language referring to "abortion" or "abortion services" was modified to "abortion-related services." S. REP. 103-117, 50 (1993). Eventually, of course, "abortion-related services" became "reproductive health services" in the final version. That these explicit references to abortion and abortion services were later softened to refer to "reproductive health services" does not change the fact that the underlying purpose of the Act was from its inception to protect abortion. S. REP. 103-117, 3.   It is therefore incontestable that FACE was enacted to protect access to abortion.

### B.  Dobbs overturned the federal right to abortion.

In *Dobbs*, the Supreme Court overruled *Roe v. Wade*, 410 U.S. 113 (1973)  and *In Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) and declared that there is no federal right to abortion. "We hold that *Roe* and *Casey* must be overruled. The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of *Roe* and *Casey* now chiefly rely—the Due Process Clause of the Fourteenth Amendment." 142 S. Ct. at 2242. The Court exhaustively analyzed "the critical question whether the Constitution, properly understood, confers a right to obtain an abortion" – a question that *Roe* and *Casey* "skipp[ed] over." *Id*. at 2244. It also considered whether the doctrine of *stare decisis* required continued acceptance of the judicially-created "right." The Court found that  "*Roe* was egregiously wrong from the start," *id*. at 2243, and that *Casey*, although reaffirming *Roe's* central holding, "revised the textual basis for the

abortion right, silently abandoned *Roe's* erroneous historical narrative, and jettisoned the trimester framework." *Id*. at 2266. The majority, finding no support for the right to abortion in the text of the Constitution or in our nation's history, concluded simply: "We therefore hold that the Constitution does not confer a right to abortion. *Roe* and *Casey* must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives." *Id.* at 2279.

Whatever the virtues of abortion as a policy goal, once thing is clear after *Dobbs* – there is no federal constitutional right to abortion, and the very reason for FACE's existence no longer exists. As a result, FACE has not only lost its purpose, it has also lost its constitutional validity.

## III.   THE FACE ACT IS UNCONSTITUTIONAL CONTENT-BASED REGULATION OF SPEECH

The FACE Act is facially unconstitutional because it discriminates against expressive activity based on content and/or viewpoint. The Indictment should be dismissed for this reason  as well.

A defendant may challenge "a defect in the indictment or information"—including its constitutionality—as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). In making such a challenge, a defendant may challenge a statute as unconstitutional on its face or as applied to the conduct alleged. *See Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022). Both the Supreme Court and the Second Circuit have recognized that "'[a]lthough facial challenges are generally disfavored, they are more readily accepted in the First Amendment context.'" *Id.*, quoting *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988). In order to show that a statute is facially unconstitutional, a defendant must demonstrate "'that no set of circumstances exists under which [the challenged statute] would be valid,' or that the statute lacks any 'plainly legitimate sweep.'" *Picard* at 101,

*quoting United States v. Stevens*, 559 U.S. 460, 472 (2010) (citations omitted). In contrast, an as-applied challenge "'requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right.'" Picard at 101, quoting Field Day, LLC v. County of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006).

It is well settled that the protection of the First Amendment "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Conduct, too, "may be sufficiently imbued with elements of communication to fall within the scope" of the First Amendment." *Id.* (cleaned up). The High Court "has repeatedly stated, these rights are not confined to verbal expression. They embrace appropriate types of action . . ." *Brown v. Louisiana*, 383 U.S. 131, 141—142 (1966). Consequently, "[t]he First Amendment generally prevents government from proscribing speech ... or even expressive conduct ... because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted).

Williams and Chavannes were engaged in quintessential expressive conduct. As the Indictment states, the incident was live streamed by more than one participant. Their conduct, consisting not merely in a nonverbal sit-in but also prayer, Bible reading, hymn singing, and of protest and evangelistic outreach, is plainly protected by the First Amendment. The Government, however, took pains to charge Williams and Chavannes with the harshest violation of FACE it could find, expressing its disdain for the defendants' pro-life message.

"The First Amendment, . . . prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1). The Government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based

laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (citations omitted).   And it is the Government, not the defendants, that carries the burden to prove narrow tailoring and a compelling government interest. *McGlone*, 749 F. App'x at 409.

### A.   *Reed and McCullen changed the landscape on content neutrality.*

*Reed*, together with *McCullen v. Coakley*, 573 U.S. 464 (2014), clarified that a regulation of speech is facially and *objectively* content based when it defines "regulated speech by a particular subject matter," or, "more subtle[ly]," when it regulates speech based on "its function or purpose," even when there is no invidious intent. *Reed*, 576 U.S. at 163, 165-66. Further, a law is content based if enforcement authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479.

### B.   *FACE is content based.*

The FACE Act does not prohibit all interference with individuals near reproductive health care facilities, but only those who do so *because* that person is "obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1) (emphasis added). Accordingly, the Government must examine the content of Williams and Chavannes messages to determine their motivation before applying FACE. Such a determination renders the law content-based on its face under *McCullen* and *Reed*. Had the exact same actions that Defendants are alleged to have committed were undertaken not by pro-life advocates, but by, for example, a Black Lives Matter group  upset with a White abortionist and an all-White staff, it would *not* violate FACE. Or again, a sit- in by a group of Martin Luther King, Jr. followers who object to the facility not treating African- Americans would not violate the Act, even though their conduct was *identical* to that of the Defendants. Their actions would not have been undertaken because the objects of

their protest were "obtaining or providing reproductive health services," but because of their race.

The Senate was clear in its discussions and careful in its drafting to specifically *exclude* certain actors from the reach of FACE:

> Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act (though their conduct might violate some other law, such as a local trespass law). In that example, **the demonstrators' motive** is related to the facility's emissions policy and practices and **not** to its policy and practices on abortion-related services. **The Committee has concluded that inclusion of the motive elements is important to ensure that the Act is precisely targeted at the conduct that,** as the Committee's record demonstrates, **requires new Federal legislation; deliberate efforts to interfere with the delivery of abortion-related services**.

S.Rep. No. 103-117, 103rd Cong., 1st Sess. 24 (1993) (emphasis added). Again, not all physical obstruction is prohibited under FACE; only that undertaken for purposes with which the Government disagrees, i.e., pro-life purposes. FACE is not content neutral.

The Second Circuit incorrectly held in *United States v. Weslin*, 156 F.3d 292 (2d Cir. 1998) that "FACE prohibits obstruction of reproductive health clinics regardless of the issue that animates the demonstrators." *Id.* at 297. As discussed above, FACE does *not* prohibit *all* obstruction of reproductive health clinics, but only those motivated by the wrong purpose – that is the purpose motivating Williams and Chavannes.  A protestor's "ideology or message" is an integral part of the calculus in determining whether FACE applies to the conduct to the extent it informs her motivation for "interfering with" a person seeking or providing "reproductive health services."  *Weslin* was decided decades before the Supreme Court clarified the content neutrality analysis in *McCullen* and *Reed*; incorporating that more prescient analysis might well lead the Second Circuit to a difference result.

19

Indeed, had *Weslin* instead applied the analytical framework required by *McCullen* and *Reed* it would have found FACE to be content based on its face - "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 429 (1993)). "Although a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary." *Id.*

A law is content based on its face if, as *Reed* counsels, it "target[s] speech based on its communicative content;" that is, it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163; *see also City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (same) [28]; *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, concurring in part, joined by Ginsburg, Sotomayor, and Kagan). Under *Reed*, FACE is content based on its face because it applies to particular speech – namely, pro-life speech – because of the message expressed. It prohibits pro-life sit-ins, but not race-based sit-ins. Nor does it prohibit a pro-abortion sit-in if, for example, an abortion facility's staff decided suddenly to cease doing abortions and a "Jane's Revenge" team came and blockaded the doors to protest the staff's decision.

### C. FACE fails strict scrutiny.

As a content-based regulation affecting speech, FACE must be subjected to strict  scrutiny. That is, the restriction survives only if it is narrowly tailored to be the least-restrictive means available to serve a compelling government interest and that standard is a difficult one; "we readily acknowledge that a law rarely survives such scrutiny. . .". *Burson v. Freeman*, 504 U.S. 191, 199-200 (1992). Here, the Government cannot show a *compelling* interest in  preserving access to abortion-less "reproductive health services." After *Dobbs*, abortion can no longer be

considered a part of "reproductive health care." All the evidence amassed to justify the enactment of FACE and to defend its constitutionality concerning women traveling interstate to obtain abortions because abortion facilities were not available in their state, or blockades by "anti-abortion" activists, etc., may no longer be considered.[29] Gutted of its abortion rationale, FACE lacks a compelling interest, and the Act fails strict scrutiny.

Even assuming *arguendo* that the Government could demonstrate a compelling interest necessitating FACE after *Dobbs*, it would still fail strict scrutiny because it is not the least restrictive means of serving that interest. There are numerous less restrictive means available to secure the interest, for example, in protecting sidewalk access and public safety, as the Supreme Court instructed in *McCullen v. Coakley*, 573 U.S. 464 (2014), such as enforcing already existing criminal laws prohibiting trespass, blocking of the sidewalk, threats of force, and so forth, or securing narrowly tailored injunctions, etc.  In fact, the actions Williams and Chavannes could have been adequately prosecuted by the New York Police Department ("NYPD") for allegedly violating a number of local laws and neither Williams nor Chavannes were ever charged with violating any laws on June 19-20, 2020, by the NYPD.  To be sure, a FACE prosecution was entirely unnecessary here.

In addition, *McCullen* requires that even content-neutral regulations of speech in the public forum not overly burden speech and be narrowly tailored to serve a valid government interest. The Supreme Court struck down the state statute in *McCullen* even after finding it was content neutral, because it failed to meet the narrow tailoring requirements. *McCullen* announced a hard and fast rule: "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." 573 U.S. at 495. The Government cannot satisfy this standard, either, once the abortion-protection rationale is

removed from FACE.

The Second Circuit in *Weslin,* again failing to consider the analysis of *Reed* and *McCullen* rejected applying strict scrutiny analysis to a FACE challenge; instead the *Weslin* court found FACE regulated conduct and not speech thereby applying a lower standard of scrutiny spelled out in *US v. O'Brien*, 391 U.S. 367 (1969).  The decision in *Weslin*, is misplaced as discussed *supra.*

In short, FACE neither serves a compelling government interest nor employs the least restrictive means to serve any such interest. It therefore fails strict scrutiny and is unconstitutional on its face. The Indictment should be dismissed as content based.

## IV. THE GOVERNMENT'S INDICTMENT ALSO VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT AND THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT

For similar reasons, given the discriminatory treatment of Williams and Chavannes and the religious motivations for their conduct, the Indictment should be dismissed for violating the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA"), and the Free Exercise Clause of the First Amendment.

### A. *FACE is unconstitutional as applied because it violates RFRA.*

RFRA applies to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993," "unless," as to any law passed after that date, the "law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-39(a), (b). FACE was adopted in May 1994 but makes no reference to RFRA, *see* 18 U.S.C. § 248; FACE is thus subject to its rigorous requirements.

Under RFRA, the Government may not enforce even a facially neutral federal law in a manner that substantially burdens a person's religious exercise, unless the Government demonstrates that the burden is "the least restrictive means" of furthering a "compelling

government interest" as applied. 42 U.S.C. § 2000bb-1(b)(1), (2). In other words, substantial burdens on religious exercise must pass strict scrutiny—"the most demanding test known to constitutional law," which "will often be difficult" for the Government to satisfy. *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997).

It is undisputed that Williams and Chavannes' pro-life praying, singing, Bible reading, and counseling is religiously motivated. Accordingly, application of FACE, which is of doubtful constitutionality after *Dobbs*, to the nonviolent religiously motivated actions of the defendants three years ago, with FACE Act's harsh prison terms (up to 10 years in jail) and exorbitant fines—easily constitute a "substantial burden" under RFRA. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

The Government's prosecution of these Defendants must therefore satisfy strict scrutiny. But government action "cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). And here, as noted, the Government has refused to prosecute the more than 150 nationwide incidents of damage and destruction inflicted on pregnancy centers and churches expressly protected by FACE. Thus, even assuming *arguendo* that some Defendants violated FACE (which they deny), the Government can "offer[] no compelling reason why it has a particular interest in denying an exception to [them] while making them available to others." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021).

Even if the Government had a compelling interest, the "least restrictive-means standard is exceptionally demanding," requiring it to show it lacks any "other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728. Here the evidence of any actual interference with abortion access is weak at best. The Indictment alleges that a single person, a Healthcare Center

volunteer, was prevented from entering the clinic (but ultimately was able to enter the clinic) and that the volunteer's hand was injured after getting caught in the entrance door to the clinic.

In any event, the local prosecution process is a manifestly less restrictive means. The NYPD was present on the scene during the events of June 19, 2020 and June 20, 2020, and the NYPD made no arrests at all. Indeed, it does not appear that any Health Center staff or anyone else seeking reproductive services made any kind of complaint to the NYPD or other local law enforcement. At no point where Williams or Chavannes ever charged with violating New York state laws. FACE itself states that it does *not* provide "exclusive criminal penalties" nor "preempt State or local laws that may" penalize the conduct covered by FACE. 18 U.S.C. § 248(d)(3). Given that Williams and Chavannes' religious motivations and the arguable lack of actual interference with abortion access, the FACE-acknowledged local-prosecution process is plainly a less restrictive means of achieving the same interest. Thus, the Government's Indictment fails strict scrutiny and violates RFRA.

## B.  FACE is unconstitutional as applied because it violates the Free Exercise Clause.

While neutral laws of general applicability that burden religious exercise are presumptively valid, government action "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1878. Such laws must also undergo strict scrutiny.

Importantly, "de facto exemptions can demonstrate that a challenged [government action] is not generally applicable." *Soos v. Cuomo*, 470 F. Supp. 3d 268, 280 (N.D.N.Y. 2020). That is exactly the case here, given the Government's radically lopsided enforcement of FACE against Defendants' religiously motivated conduct while thus far turning a blind eye to the nationwide violence against pregnancy resource centers and churches, often with the result of delaying or

entirely shutting down their services.[14]

Therefore, the Government's blatant over- and under-inclusivity—enforcing FACE against nonviolent pro-life individuals, while refusing to enforce it against violent pro-choice individuals who have stymied or effectively destroyed pro-life pregnancy centers, easily triggers strict scrutiny, which the Government fails for the reasons already discussed.

Accordingly, the Indictment should also be dismissed for violating RFRA and the Free Exercise Clause.

## V.  AFTER *DOBBS*, FACE EXCEEDS CONGRESS' POWER UNDER THE COMMERCE CLAUSE, AND NO FEDERAL CIVIL RIGHTS INTEREST CAN SUPPORT FACE'S CONSTITUTIONALITY

After the Supreme Court decision in *Dobbs v. Jackson Women's Health Org.*, FACE is exposed as unconstitutional by virtue of the lack of Congressional authority to sustain it under the Commerce Clause. Unlike many other federal criminal statutes, FACE contains no express jurisdictional element—a factor that is often used to prevent statutes, and their application, from exceeding the powers granted to the federal government under the Commerce Clause.

Article I, section 8, clause 3 of the U.S. Constitution grants Congress the power to regulate interstate commerce. This has been interpreted to reach three subjects of regulation: "the use of the channels of interstate commerce;" "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and "activities having a substantial relation to interstate commerce . . . *i.e.*, those activities that substantially affect interstate commerce[.]" *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (internal citations omitted).

"While this final category is broad, 'thus far in our Nation's history our cases have  upheld

---

[14] *See, e.g.*, Nicole Ault, "The Attacks on Crisis-Pregnancy Centers," Wall Street Journal, June 20, 2022, https://www.wsj.com/articles/the-attacks-on-crisis-pregnancy-centers-janes-revenge- abortion-roe-v-wade-violence-destroyed-11655653644.

Commerce Clause regulation of intrastate activity only where that activity is economic in nature.'" *United States v. Morrison*, 529 U.S. 598, 613 (2000) (quoting *Lopez*, 514 U.S. at 559- 60).  It is beyond quibble that Williams and Chavannes' conduct is not "part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

One of the powers the federal government lacks that the states retain is a general police power. "For nearly two centuries it has been 'clear' that, lacking a police power, 'Congress cannot punish felonies generally' . . . A criminal act committed wholly within a State 'cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.'" *Bond v. US*, 572 U.S. 844, at 854 (internal citations omitted). Thus, it must be clear that Congress intended to reach crime of a local nature before a federal statute will be construed to criminalize such conduct. *Id.* at 860.

"[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" regarding criminal law since "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *United States v. Bass*, 404 U.S. 336, 349 (1971). *See Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 841-42 (4th Cir. 1999) (describing most crimes as matters of traditional state concern) ("Congress not only has encroached upon the States' ability to determine when and how violent crime will be punished . . . but in so doing has blurred the boundary between federal and state responsibility for the deterrence and punishment of such crime."). FACE was an affront to principles of federalism when enacted. Now, after *Dobbs*, it is flatly inconsistent with them.

Recently, the Second Circuit was presented with a Commerce Clause challenge to FACE

Act wherein the majority opinion demurred resolving that constitutional question. *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47 (2d Cir. 2021), *cert. denied*, 214 L. Ed. 2d 17, 143 S. Ct. 90 (2022).   However, Judge Walker filed a concurring opinion and squarely addressed Commerce Clause challenge presented here:

> In prohibiting violence against worshippers at places of religious worship, FACEA (sic) regulates *local, non-economic conduct that has at best a tenuous connection to interstate commerce*. The Supreme Court in *United States v. Lopez* and *United States v. Morrison* expressly rejected the notion that the commerce power reaches "noneconomic, violent criminal conduct" of the sort proscribed here "based solely on that conduct's aggregate effect on interstate commerce." I therefore would reach and sustain the Commerce Clause challenge to the religious exercise provision of FACEA, 18 U.S.C. § 248(a)(2), and would reverse the district court's denial of summary judgment to defendants.

*Id.*  at 63-64 (Walker, J. concurring).

To be sure Judge Walker's concurrence differentiates places of religious worship from abortion clinics, noting legislative findings that found specific interstate commerce regarding the nature and business of abortion clinics. *Id.* at 66.  The existence of such findings do not insulate §248(a)(1) from a Commerce Clause challenge, and the logic of Judge Walker's Commerce Clause argument should apply with equal force to abortion clinics.

Without a basis for the Court's exercise of federal jurisdiction, the Indictment should be dismissed.

## Conclusion

For all the foregoing reasons, Defendants respectfully move this Court for an order dismissing the Indictment and all charges in this case.