UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

BEVELYN BEATTY WILLIAMS and
EDMEE CHAVANNES,

Defendants.

Case No. 1:22-cr-00684 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Defendants Bevelyn Beatty Williams ("Williams") and Edmee Chavannes ("Chavannes" and, collectively, "Defendants") are charged with violating the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248(a) ("Section 248" or the "FACE Act"), and Title 18, United States Code, Section 371. *See* ECF No. 2 ("Indictment"). On August 14, 2023, Defendants moved to dismiss the Indictment on the grounds that: (i) the Government has improperly targeted them for prosecution; (ii) the FACE Act exceeds Congress's Commerce Clause power and is unconstitutional after the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022); (iii) the FACE Act is an impermissible content-based regulation of speech; and (iv) their prosecution violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.S. § 2000bb-1, and their free exercise of religion. *See* ECF Nos. 55 ("Mot."), 56 ("Br."), 58 ("Reply"). The Government opposes the motion. *See* ECF No. 57 ("Opp."). For the reasons set forth below, the motion to dismiss is DENIED.

## BACKGROUND

The following facts are drawn from the Indictment and assumed to be true for purposes of the motion to dismiss. *See United States v. Mango*, 199 F.3d 85, 89 (2d Cir. 1999); *United States v. Navarro*, 551 F. Supp. 3d 380, 384 n.1 (S.D.N.Y. 2021).

1

Defendants Williams and Chavannes are founders of At the Well Ministries, Inc. ("At the Well Ministries"), a non-profit organization established in 2014.  Indictment ¶ 1.  As charged in the Indictment, Defendants individually and through At the Well Ministries engaged in a multi-year effort to prevent patients from receiving, and health-care staff from providing, reproductive health services in centers across the country.  *Id.* ¶¶ 1, 3-5.  For years, Defendants agreed to use, and used, force, threats of force, and physical obstruction to injure, intimidate, and interfere with patients and providers of reproductive health services.  *Id.* ¶ 2.

Specifically, the Indictment alleges that Defendants obstructed access to a health-care services provider in Lower Manhattan (the "Health Center").  *Id.* ¶ 3.  The Health Center administers a range of reproductive health services, including abortion care.  *Id.*  During a two-day event sponsored by At the Well Ministries on June 19 and 20, 2020, Defendants issued threats, used force, and blocked patient and staff access to the Health Center.  *Id.* ¶ 4.

On June 19, 2020, Williams threatened to "terrorize" the Health Center on a livestreamed video she recorded outside of the facility.  *Id.* ¶ 4(a).  She stated:

> This is going to be a wonderful day.  We are going to terrorize this place.  And I want the manager to hear me say that.  We are going to terrorize this place.  More people are coming.  More and more and more and more and more.  And we're going to make sure we terrorize you guys so good.

*Id.*  That same day, Chavannes forced a Health Center staff member, identified in the Indictment as "Victim-1," against metal barricades that the New York City Police Department had set up around the Health Center's patient entrance, while yelling "do not touch me" within inches of Victim-1's face.  *Id.* ¶¶ 4(b), 8(a).  Both Williams and Chavannes stood directly in front of the Health Center's entrances, initially blocking the patient entrance, and – after staff diverted

patients to the staff entrance – blocking that entrance as well and directing others to do the same. *Id.* ¶ 4(c).

Williams and Chavannes continued to block the Health Center's entrances the following day. *Id.* Williams prevented a volunteer, identified in the Indictment as "Victim-2," from entering the Health Center by pressing her own body against the patient entrance door and refusing to move. *Id.* ¶ 4(d). When a staff member, Victim-1, attempted to open the door for the volunteer, Williams leaned against the door, crushing the staff member's hand. *Id.* ¶¶ 4(d), 8(b). Williams continued to trap the staff member's hand as she sang, "We shall not be moved," and the staff member yelled, "She's crushing my hand." *Id.* Williams also stated on a livestreamed video: "We gonna stand here and we ain't moving. We not moving. We're standing here, so I guess no women will be coming in for abortions today. It's a warzone." *Id.* ¶ 4(e).

Defendants engaged in similar actions at other health clinics across the country. *See id.* ¶ 5. In January 2022, Defendants traveled to a reproductive health center in Fort Myers, Florida, where they sought to prevent individuals seeking and providing reproductive health services from entering the center, and repeatedly directed others to block its entrances. *Id.* ¶¶ 5(a)-(b), 8(c). In July 2022, Defendants attempted to enter two reproductive health centers in Nashville, Tennessee by falsely purporting to seek health-care services. *Id.* ¶ 5(c). Williams threatened to "terrorize" one of those centers if she was denied entrance, stating on a livestreamed video, "[e]ither they going to let us in, or we're going to take the whole building down. It's up to them." *Id.* Defendants also entered multiple reproductive health centers in Atlanta, Georgia that month to prevent individuals seeking and providing services from accessing the centers. *Id.* ¶ 5(d). In August 2022, Defendants similarly entered multiple reproductive health centers in Brooklyn, New York on false pretenses of seeking their services. *Id.* ¶ 5(e). Defendants

recorded themselves yelling in patient waiting rooms, broadcast on social media the full names of health-center staff, and captured images of staff and patients.  *Id.*

In December 2022, a grand jury returned the Indictment, charging Defendants with violating the FACE Act and Section 371.  *See* Indictment; Opp. at 3.  Count One charges both Defendants under Section 371 for conspiracy to violate the FACE Act.  Indictment ¶¶ 1-8. Counts Two and Three charge Williams and Chavannes, respectively, for violations of the FACE Act.  *Id.* ¶¶ 9-12.  On August 14, 2023, Defendants filed a joint motion to dismiss the Indictment. *See* Br.  That motion, which the Government opposes, is now fully briefed.  *See* Opp.; Reply.

## LEGAL STANDARDS

### I.  Federal Rule of Criminal Procedure 12(b)

Federal Rule of Criminal Procedure ("Rule") 12(b)(1) allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Under Rule 12(b)(2), a criminal defendant may, at any time, move to dismiss an indictment for lack of jurisdiction.  Under Rule 12(b)(3), a criminal defendant may, before trial, move to dismiss an indictment based on "a defect in instituting the prosecution" or a "defect in the indictment."  Rule 12(b)(3)(A), (b)(3)(B).[1]

On a Rule 12(b) motion, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999); *accord Navarro*, 551 F. Supp. 3d at 388 (applying standard to Rule 12(b)(3) motion); *United States v. Abdalla*, 334 F. Supp. 3d

---

[1] In their Notice of Motion, Defendants move "pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C)" to dismiss the indictment.  Mot.  However, Rule 12(b)(3)(C) pertains to the "suppression of evidence."  In their moving brief, Defendants state that they "move pursuant to Rule 12(b)(3)(A)(iv) to dismiss" based on selective prosecution and other grounds.  *Id.* at 2; *see id.* at 3.  The Court will construe Defendants' motion to dismiss broadly as falling under both Rules 12(b)(2) and 12(b)(3).

582, 585 (S.D.N.Y. 2018) (applying standard to Rule 12(b)(2) motion). "[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Corbin*, 729 F. Supp. 2d 607, 611 (S.D.N.Y. 2010) (alteration in original) (quoting *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998)). Instead, "fact questions raised by an Indictment are the province of the jury." *Id.* (citation omitted).

## II. Statutory Framework

The FACE Act protects individuals' access to reproductive health services and places of religious worship. *See* 18 U.S.C. § 248. At issue here is Section 248(a)(1), which imposes civil and criminal liability when a person:

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

*Id.* § 248(a)(1); *see id.* §§ 248(b)-(c). Notably, Section 248(a)(2) similarly imposes liability when a person uses force, threats of force, or physical obstruction against a "person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of worship," and Section 248(a)(3) imposes liability when a person intentionally damages or destroys property that provides "reproductive health services" or "a place of religious worship."

The FACE Act provides a set of definitions and rules of construction. It defines "reproductive health services" as "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counseling or referral services relating to the human reproductive system." *Id.* § 248(e)(5). Such services include, but are not limited to, those "relating to pregnancy or the termination of a pregnancy." *Id.* The statute also instructs that it shall not be construed "to prohibit any expressive conduct (including

peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." *Id.* § 248(d)(1).

## DISCUSSION

Defendants seek to dismiss the Indictment on several grounds.  First, they argue that the Government has improperly targeted them for prosecution.  Second, relying on *Dobbs*, they argue that the FACE Act exceeds Congress's Commerce Clause power and is unconstitutional absent a federal constitutional right to abortion.  Third, they argue that the FACE Act is an impermissible content-based regulation of speech.  Finally, Defendants contend that their prosecution violates the RFRA and their free exercise of religion.  *See generally* Br.; Reply.

Defendants acknowledge that "the Second Circuit has previously considered some of the[ir] arguments," and rejected them, before *Dobbs*.  Reply at 2.  They also recognize that "other Circuits have considered some of these same arguments post-*Dobbs*," *id.*, and "[i]n each of those cases, similar motions to dismiss were filed and denied," Br. at 2 n.1.  Defendants ask this Court to set aside that precedent "given the specific facts of this case and the post-*Dobbs* developments."  Reply at 2.  The Government urges this Court, "consistent with every other court to have considered these arguments," to deny Defendants' motion. Opp. at 1.  The Court addresses the arguments in turn.

### I.  Selective Prosecution

Defendants seek to dismiss the Indictment for selective prosecution, arguing that the Government has targeted them because of their "pro-life" views.  *See* Br. at 5-14.  The standard for proving a selective-prosecution claim is "a demanding one."  *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  "Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"  *United States v. Texas*, 143 S. Ct. 1964, 1971 (2023) (quoting *TransUnion LLC v.*

*Ramirez*, 141 S. Ct. 2190, 2207 (2021)).  The Government "retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380, n.11 (1982)).  "As a result, 'the presumption of regularity supports' . . . prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.'"  *Armstrong*, 517 U.S. at 464 (alteration adopted) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)); *see United States v. Stewart*, 590 F.3d 93, 122 (2d Cir. 2009) (noting a similar presumption for vindictive-prosecution claims).

To establish a selective-prosecution claim, a defendant must present "clear evidence" that the decision to prosecute not only (1) "had a discriminatory effect" but also (2) "was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465 (citations omitted); *accord United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003).  For the first element, a defendant must establish that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant" and that the defendant has been "singled out." *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992) (alteration adopted) (quoting *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983)).  For the second element, a defendant must establish that the Government's "selection of the defendant for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Id.* (alteration adopted) (quoting *Moon*, 718 F.2d at 1229).  "In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand

jury, generally rests entirely in his [or her] discretion.'"  *Armstrong*, 517 U.S. at 464 (quoting

*Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

In this case, Defendants have not come forward with direct evidence of a discriminatory

purpose and effect.  Instead, they cite a variety of sources to support their defense through

circumstantial evidence.  *See* Br. at 7-13.  Defendants state that the Department of Justice (the

"DOJ") has not prosecuted as many "incidents of violence against pro-life pregnancy centers and

churches nationwide in the wake of the leak and publishing of *Dobbs*" as Defendants believe is

warranted.  Br. at 8.  They state that the DOJ has "indicted only two pro-abortion activists out of

at least 81 estimated attacks against pro-life groups" since *Dobbs*.  *Id.*  They similarly contend

that the DOJ has initiated thirteen criminal prosecutions against "pro-life defendants" since 2020,

while bringing only one prosecution against "pro-abortion defendants" during that time.  *Id.*

Defendants argue that these statistics coincide with the formation by the DOJ of a "Reproductive

Rights Task Force" designed, in part, to "identify ways to protect access to reproductive health

care."  *Id.* at 9 (citation omitted).

Defendants' argument that the Government has impermissibly singled them out because

of their "pro-life" views fails for multiple reasons.  First, Defendants largely rely on "evidence"

that is not properly before the Court.  *See* Br. at 8-13.  Defendants repeatedly cite as evidence an

article from The Daily Signal titled, "DOJ's Kristen Clarke: A Pro-Abortion Activist Enforcing

the Law Against Pro-Lifers."  Br. at 8 n.2; *see also id.* at 9 n.6; 11 n.8 & n.10; 13 n.12.  The

Daily Signal describes itself as an outlet created for, and by, "The Heritage Foundation, a think

tank with the mission of formulating and promoting conservative public policies."  *About The*

*Daily Signal*, Daily Signal, https://www.dailysignal.com/daily-signal/ [https://perma.cc/8E4H-

5CWU].  Defendants seemingly invite the Court to take judicial notice of matters asserted by this

source.  *See* Br. at 8 n.2.  But Defendants do not even allege, nor can the Court reasonably infer, that the facts asserted are "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2) (stating requirements for judicial notice).  Nor do Defendants request judicial notice, or show that judicial notice would be permissible, for their other sources.  *See* Br. at 8-9, 11-13; *see also Armstrong*, 517 U.S. at 470 (concluding that deficient sources "did not constitute . . . evidence tending to show the existence of the essential elements of a selective-prosecution claim" (internal quotation marks and citation omitted)); *United States v. Gallagher*, --- F. Supp. 3d ----, No. 3:22-cr-00327, 2023 WL 4317264, *8 (M.D. Tenn. July 3, 2023) (stating that "citations to overtly ideological websites making claims about a supposed epidemic of crime . . . by supporters of the right to access abortion" are not "evidence").

Second, even if the Court considers their evidence, Defendants fail to show any discriminatory effect, the first element of their defense.  *See Armstrong*, 517 U.S. at 465.  To prove discriminatory effect, Defendants must show that individuals who are "similarly situated" and hold a different viewpoint have gone unprosecuted.  *Fares*, 978 F.2d at 59 (quoting *Moon*, 718 F.2d at 1229).  "This requires showing that individuals outside the protected class committed roughly the same crime in roughly the same circumstances but were not prosecuted."  *United States v. Parnas*, No. 19-cr-00725 (JPO), 2021 WL 2981567, at *7 (S.D.N.Y. July 14, 2021).  Here, Defendants have not identified any specific unprosecuted individual, let alone an individual with a viewpoint different from Defendants, who allegedly committed the same crime as Defendants, in substantially the same way as Defendants, and for which the Government has at least as strong evidence to prosecute.  *See generally* Br. at 7-14; Reply at 2-4.  Although Defendants argue that the Government has "refus[ed] to apply FACE to pro-abortion activists,"

Br. at 9, Defendants do not identify specific "activists" or explain how they are similarly situated to Defendants.

Even if the Court looks beyond Defendants' briefs, the underlying sources they cite do not identify similarly situated individuals who have gone unprosecuted. Instead, the sources generally describe after-hours vandalism of a "crisis pregnancy center" that apparently occurred when no patients or staff were present, did not result in physical injury, and (at least in some instances) did not lead to arrests or identifiable suspects. *Id.* at 9 n.5, 11 n.7. "This is a stark contrast to the direct physical obstruction, targeted at actual patients and employees, performed by these [D]efendants in open view of witnesses during ordinary business hours." *Gallagher*, 2023 WL 4317264, at *8 (rejecting selective-prosecution claim by defendants charged with obstructing reproductive health-care centers).

Nor do the DOJ sources and statistics that Defendants cite support their argument. To the contrary, the DOJ indicates that it indicted four defendants this year with both conspiracy and FACE Act offenses for "targeted attacks on pregnancy resources centers" that intimidated reproductive health-care providers. *Recent Cases on Violence Against Reproductive Health Care Providers*, U.S. Dep't of Just., https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers [https://perma.cc/H23N-K6AN]; *see* Br. at 8 n.4. Similarly, Defendants cite an article in which the Federal Bureau of Investigation reported having "a number of investigations . . . into attacks or threats against pregnancy resource centers, faith-based organizations and other pro-life organizations," that there are "about 20 field offices involved" in these investigations, and that the Government "take[s] it very seriously." Br. at 8 n.3 (citing Timothy H.J. Nerozzi, *Pro-Life Centers Targeted by 70% of Abortion-Related Violent Threats Since Dobbs Decision: FBI*, Fox News (Nov. 17, 2022, 2:49 PM),

https://www.foxnews.com/politics/pro-life-centers-targeted-70-abortion-related-violent-threats-

dobbs-decision-fbi [https://perma.cc/7GV8-CPRL]).  Thus, these sources do not support

Defendants' argument that they have been targeted due to their opposition to abortion access.

Defendants' argument that more "pro-life" than "pro-choice" individuals have been

prosecuted for FACE Act offenses is similarly unavailing because Defendants have not shown

any similarly situated "pro-choice" individuals that the Government has declined to prosecute.

"[A] group cannot obtain constitutional immunity from prosecution by violating a statute more

frequently than any other group."  *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998) (per

curiam) (citation omitted); *see United States v. Soderna*, 82 F.3d 1370, 1376 (7th Cir. 1996) ("It

is true that [Section 248] is being enforced mainly against opponents of abortion.  But this is

because it is mainly they who are interfering with the provision of pregnancy-related services."

(emphasis omitted)); *see also Armstrong*, 517 U.S. at 470 (rejecting study that showed certain

category of defendants were all black because it "failed to identify individuals who were not

black and could have been prosecuted for the offenses for which the respondents were charged,

but were not so prosecuted"); *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam)

(stating that "raw statistics regarding overall charges say nothing about charges brought against

similarly situated defendants" (emphasis omitted)).

Third, in addition to a discriminatory purpose, Defendants also fail to show a

discriminatory intent.  *See Armstrong*, 517 U.S. at 465.  Defendants argue that a DOJ press

release is evidence of such an intent because it indicates that the DOJ formed a Reproductive

Rights Task Force to "identify ways to protect access to reproductive health care" and

"coordinate . . . proactive and defensive legal action where appropriate."  Br. at 9-10 (citation

omitted).  But Defendants have not presented facts connecting this task force to their

prosecution, let alone facts showing that the task force or its purpose is improper.  Nor have Defendants otherwise shown that the Government has prosecuted them out of a "desire to prevent [their] exercise of constitutional rights."  *Fares*, 978 F.2d at 59 (quoting *Moon*, 718 F.2d at 1229); *see United States v. Avenatti*, 433 F. Supp. 3d 552, 563 (S.D.N.Y. 2020) (rejecting selective prosecution defense because the defendant did not show that they were prosecuted "because of [their] protected status or conduct" (quoting *Wayte*, 470 U.S. at 610)).

Finally, Defendants' suggestion that their prosecution is not only selective but also "vindictive" is unavailing.  Br. at 6-7, 10-14; *see also* Reply at 2-4.  Because Defendants neither state nor apply the standard for a "vindictive prosecution" defense, it is waived for purposes of this motion.  *See Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived."); *Levine v. Lawrence*, No. 03-cv-01694 (DRH), 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[F]ailure to adequately brief an argument constitutes waiver of that argument.").  Even if considered, the defense would fail because vindictive prosecution requires "a finding of 'actual' vindictiveness" or "a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action."  *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999) (per curiam).  There is neither actual evidence nor a basis to presume an improper motive here.  *See also Gallagher*, 2023 WL 4317264, at *10 (rejecting vindictive-prosecution defense because the defendants were charged under the FACE Act "pursuant to an ordinary exercise of prosecutorial discretion").

Accordingly, because Defendants have not identified "facts indicating that similarly situated individuals have not been prosecuted or that the government otherwise has operated in

bad faith," their motion to dismiss on selective prosecution grounds is denied.  *United States v. Montague*, 67 F.4th 520, 540 (2d Cir. 2023) (affirming denial of selective-prosecution defense).

## II.  The FACE Act After *Dobbs*

Defendants contend that the FACE Act is unconstitutional after *Dobbs*, arguing that the Supreme Court's decision "exposed" the statute as an impermissible exercise of the Commerce Clause and "destroyed" its sole purpose of protecting abortion access.  *See* Br. at 14-16, 25-27; *see* Reply at 4-5.  The Government disagrees, pointing to controlling Second Circuit precedent upholding the FACE Act under the Commerce Clause.  Opp. at 11-13.  The Court concludes that Defendants' argument is foreclosed by binding precedent and lacks merit.

The Commerce Clause authorizes Congress to regulate three categories of activity: "(1) 'the use of the channels of interstate commerce'; (2) 'the instrumentalities of interstate commerce, or persons or things in interstate commerce'; and (3) 'those activities that substantially affect interstate commerce.'"  *United States v. Cheng Le*, 902 F.3d 104, 118 (2d Cir. 2018) (quoting *Taylor v. United States*, 579 U.S. 301, 306 (2016)).  Under the third prong, Congress may regulate even "purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce."  *Id.* (quoting *Taylor*, 579 U.S. at 307).  Those activities must be "'economic in nature' and 'substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal.'"  *Id.* (quoting *Taylor*, 579 U.S. at 306).

In *Weslin*, the Second Circuit held that the "FACE [Act] is a valid exercise of Congress's power under the Commerce Clause."  156 F.3d at 296.  The Court reasoned that Congress had a rational basis to find that activities regulated by the FACE Act have a "substantial relation" to or "substantially affect" interstate commerce.  *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 558-59 (1995)).  Those activities include interstate travel by women to obtain reproductive health

services, *id.* (citing H.R. Rep. No. 103-306, at 6 (1993)), the purchase of medical and other

supplies by clinics in interstate commerce, *id.* (citing S. Rep. No. 103-117, at 31 (1993)), and

interstate travel by doctors to perform abortions, *id.* (citing S. Rep. No. 103-117, at 31 & n.46).

The Second Circuit therefore concluded that the FACE Act was "validly enacted under the

Commerce Clause." *Id.*

Like the Second Circuit, all other courts of appeal to consider the issue have held that the

reproductive health provisions of the FACE Act are constitutional under the Commerce Clause.

*See id.* (collecting cases); *see, e.g.*, *Norton v. Ashcroft*, 298 F.3d 547, 559 (6th Cir. 2002); *United

States v. Gregg*, 226 F.3d 253, 267 (3d Cir. 2000); *Hoffman v. Hunt*, 126 F.3d 575, 588 (4th Cir.

1997); *United States v. Bird*, 124 F.3d 667, 682 (5th Cir. 1997); *Soderna*, 82 F.3d at 1379;

*United States v. Dinwiddie*, 76 F.3d 913, 920 (8th Cir. 1996); *Terry v. Reno*, 101 F.3d 1412,

1418 (D.C. Cir. 1996); *Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir. 1995); *United States v.

Wilson*, 73 F.3d 675, 688 (7th Cir. 1995).

Courts in this District are bound to apply Second Circuit precedent "unless and until its

rationale is overruled, implicitly or expressly, by the Supreme Court or [Second Circuit]."

*United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009) (quoting *Consol. Edison Co. v. UGI

Utils., Inc.*, 423 F.3d 90, 101 n.12 (2d Cir. 2005)); *accord McKinney v. City of Middletown*, 49

F.4th 730, 746 (2d Cir. 2022).  "[R]espect for the overall structure of the federal judiciary"

requires that district courts proceed "cautiously in deciding whether an intervening Supreme

Court decision overrules Second Circuit precedent." *Hoeffner v. D'Amato*, 605 F. Supp. 3d 467,

481 (E.D.N.Y. 2022).  District courts are therefore "obliged to follow that precedent until . . .

Supreme Court precedent renders it untenable." *United States v. Emmenegger*, 329 F. Supp. 2d

416, 436 (S.D.N.Y. 2004).

Despite this clear Second Circuit precedent, Defendants argue that the "FACE [Act] was an affront to principles of federalism when enacted" and, "after *Dobbs*, it is flatly inconsistent with them."  Br. at 26.  The Court is unconvinced.  In *Dobbs*, the Supreme Court sustained a state statute prohibiting abortions after the fifteenth week of pregnancy, holding that abortion is not entitled to heightened protection under the Fourteenth Amendment.  *See* 142 S. Ct. at 2242, 2246.  The Court, however, emphasized that its decision addressed only whether the Fourteenth Amendment "confers a right to obtain an abortion."  *Id.* at 2244.  The *Dobbs* decision expressly "d[id] not prevent the people's elected representatives from deciding how abortion should be regulated."  *Id.* at 2257.

Nothing in *Dobbs* calls the constitutionality of the FACE Act into question.  *Dobbs* does not address the FACE Act.  It does not consider Congress's power to enact legislation under the Commerce Clause.  Nor does it diminish the interstate economic nature of the reproductive health field.  To the contrary, the Supreme Court in *Dobbs* expressly "return[ed]" – not removed – the power of elected officials to protect abortion access through laws like the FACE Act. *Dobbs*, 142 S. Ct. at 2259, 2277.  It also did not impact other constitutional rights that protect individuals seeking abortions after *Dobbs*, including "the constitutional right to interstate travel," which protects "a resident of [one] State from traveling to another State to obtain an abortion." *Id.* at 2309 (Kavanaugh, J., concurring).  In short, *Dobbs* does not overrule *Weslin*, which this Court is bound to apply.  The FACE Act regulates economic activities that substantially affect interstate commerce.  The statute remains, as it was before, a valid exercise of Congress's power under the Commerce Clause.

This Court's decision is consistent not only with decades of Commerce Clause jurisprudence, but also with every court that has considered the issue since *Dobbs*.  In *Gallagher*,

the court rejected as "without merit" the argument, like Defendants' argument here, that "*Dobbs*

somehow renders the FACE Act an impermissible exercise of Congress's Commerce Clause

powers."  2023 WL 4317264, at *14.  The court reasoned that *Dobbs* did not change either the

Commerce Clause jurisprudence or the interstate nature of the reproductive health field.  *Id.*  In

*United States v. Handy*, the court similarly held that "[n]othing in *Dobbs*" put the existing

Commerce Clause jurisprudence and Congress's power to protect abortion access into question.

No. 22-cr-00096, 2023 WL 4744057, at *2 (D.D.C. July 25, 2023).  Likewise, in *United States v.*

*Houck*, the court rejected the defendant's argument that *Dobbs* renders the FACE Act

unconstitutional, observing that the "determination that FACE regulates activity that has a

substantial effect on interstate commerce is supported by Supreme Court cases young and old."

No. 22-cr-00323, 2023 WL 144117, at *5 (E.D. Pa. Jan. 10, 2023) (citation omitted).

Defendants' reliance on the concurring opinion in *Jingrong v. Chinese Anti-Cult World*

*Alliance Inc.*, 16 F.4th 47 (2d Cir. 2021), a case decided before *Dobbs*, is misplaced.  *See* Br.

at 26-27.  At issue in that case was a civil claim brought by adherents of Falun Gong under

Section 258(a)(2), a provision of the FACE Act regulating "place[s] of religious worship," which

the Second Circuit held, on statutory grounds, was not violated in that case because the primary

purpose of tables on the sidewalk where flyers were disseminated was not religious worship.

*Jingrong*, 16 F.4th at 48, 62.  Concurring in the decision, Judge Walker indicated that he also

"would reach and sustain the [defendant's] Commerce Clause challenge to the religious exercise

provision."  *Id.* at 63 (Walker, J., concurring).  He reasoned that the legislative history for that

provision did not "contain any findings that connects acts of worship or violence against

worshippers at places of religious worship to interstate commerce."  *Id.* at 66.  But Judge Walker

then contrasted that provision with the reproductive health services provision at Section

258(a)(1), stating that the Second Circuit has "sustained the provision of [the FACE Act] that prohibits violence at abortion clinics, in part based on legislative findings that women, doctors, and medical supplies may travel interstate for reproductive health services." *Id.* (citing *Weslin*, 156 F.3d at 296).  Judge Walker's concurrence therefore does not, as Defendants suggest, undermine *Weslin*.

Defendants' argument that the FACE Act was "enacted only to protect abortion" and is unconstitutional in the absence of a constitutional right to abortion is unavailing.  Br. at 14; *see id.* at 14-16; Reply at 4.  The plain text of "[t]he FACE Act does not draw distinctions between particular reproductive health services." *Gallagher*, 2023 WL 4317264, at *1.  Rather, it protects all "reproductive health services," which Congress expressly defined in the statute to include "medical, surgical, counseling or referral services relating to the human reproductive system," whether "provided in a hospital, clinic, physician's office, or other facility," and regardless of whether they relate "to pregnancy or the termination of a pregnancy."  18 U.S.C. § 248(e)(5).  This includes protection of access to health services regarding contraception, counseling about alternatives to abortion, or medical services related to vasectomies.  *See also Am. Life League v. Reno*, 47 F.3d 642, 651 (4th Cir. 1995) (holding that the FACE Act "protect[s] women and men from violence and threats"); *Handy*, 2023 WL 4744057, at *2 n.3 (noting that the FACE Act "is not aimed exclusively at abortion," but rather "at all other reproductive health services").  Further, the existence of a constitutional right to abortion is irrelevant because the FACE Act was "validly enacted under the Commerce Clause." *Weslin*, 156 F.3d at 296; *cf. United States v. Scott*, 919 F. Supp. 76, 77 (D. Conn. 1996) ("Because the court finds that Congress did not exceed its authority under the Commerce Clause in enacting FACE, the court does not address whether the Fourteenth Amendment provides an independent

basis of legislative power supporting FACE's enactment."); *see also Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 354 (2d Cir. 2007) ("In light of our determination that [the statute] is constitutional under the Commerce Clause, there is no need to consider or decide whether its application could be grounded alternatively in § 5 of the Fourteenth Amendment.").

In the end, Defendants may be correct that the Supreme Court in *Dobbs* uprooted aspects of American life and law. But *Dobbs* did not cast into question the reproductive health-care provisions of the FACE Act. Accordingly, Defendants' motion to dismiss the Indictment on this ground is denied.

### III. The Free Speech Clause

Defendants argue that the FACE Act is "facially unconstitutional because it discriminates against expressive activity based on content and/or viewpoint." Br. at 16; *see id.* at 16-22. This argument, like Defendants' other arguments, is foreclosed by binding Second Circuit precedent.

In *Weslin*, after upholding the FACE Act on Commerce Clause grounds, the Second Circuit held that the statute is facially neutral and constitutional under the First Amendment. *See* 156 F.3d at 296-98. The Court rejected the defendants' argument that the "FACE [Act] regulates the expression only of people who are ideologically or morally opposed to abortion and to similar reproductive health services." *Id.* at 296. To the contrary, the Second Circuit held that the "FACE [Act] is not a viewpoint- or content-based regulation" because:

> Both by its language and its application, [the] FACE [Act] seeks to govern all people who obstruct the provision of reproductive health services. And it does so regardless of whether the obstruction is or is not motivated by opposition to abortion. Thus, 'pro-choice' protestors as well as 'pro-life' protestors come within the terms of the statute.

*Id.* (emphasis omitted). The statute "applies *whenever* access to reproductive health services is obstructed" and "contains no requirement whatsoever that the offenders intend to communicate a

particular message – or any message at all – by their obstructive actions."  *Id.*  Indeed, the FACE

Act does not even "govern speech as such but, instead, is concerned with conduct that frequently

has expressive components."  *Id.*

The Second Circuit next determined that the FACE Act passes constitutional muster as a

viewpoint- and content-neutral law.  It held that the FACE Act "serve[s] an important or

substantial government interest," *id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 377

(1968)), "in ensuring public safety and order, promoting the free flow of traffic on streets and

sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-

related services," *id.* (quoting *Schenck v. Pro-Choice Network*, 519 U.S. 357, 376 (1997)).  It

then held that "those interests are unrelated to the suppression of free expression," and that the

"FACE [Act] is narrowly tailored."  *Id.* at 298.

Defendants argue that the "Second Circuit incorrectly [up]held" the FACE Act in *Weslin*,

and that the Supreme Court's decisions in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), and

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), "might well lead the Second Circuit to a

difference [sic] result."  Opp. at 19.  Defendants' argument is easily rejected.

This Court is bound to apply *Weslin*, and neither *McCullen* nor *Reed* disturbs that

holding.  In *McCullen*, the Supreme Court held unconstitutional a Massachusetts statute that

required certain individuals to stay at least 35 feet away from abortion clinics because "the buffer

zones burden[ed] substantially more speech than necessary to achieve the Commonwealth's

asserted interests."  573 U.S. at 491.  However, the Court cautioned that the statute at issue was

"truly exceptional," *id.* at 490, and explained that Massachusetts alternatively "could enact

legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (FACE

Act)," *id.* at 491.  Consistent with *Weslin*, the Court also reiterated that "a facially neutral law

does not become content based simply because it may disproportionately affect speech on certain topics," that "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways" are significant government interests, and that a content- and viewpoint-neutral statute, like the FACE Act, is not subject to strict scrutiny. *Id.* at 480, 485. Nothing in *McCullen* overrules *Weslin* or calls it into question.

The Supreme Court's decision in *Reed* bears even less resemblance to this case. At issue there was a municipal code that prohibited the display of outdoor signs anywhere within the town without a permit, except for "23 categories of signs," ranging from "Ideological Signs," to "Political Signs" and "Temporary Directional Signs." 576 U.S. at 159-60 (alterations adopted). Because "[t]he restrictions in the Sign Code that apply to any given sign thus depend[ed] entirely on the communicative content of the sign," the Court held that the code was "content based on its face." *Id.* at 164. This is inapposite to *Weslin*, where the Second Circuit expressly held that application of the FACE Act does not depend on the communication of "a particular message – or any message at all." 156 F.3d at 297.

Additionally, Defendants' argument that *McCullen* and *Reed* overrule *Weslin* has already been rejected in this Circuit. In *New York ex rel. Underwood v. Griepp*, the defendants argued that *McCullen* and *Reed* "undermine the Second Circuit's decision in *Weslin* to such a degree" that the constitutionality of the FACE Act should be reconsidered. No. 17-cv-03706 (CBA), 2018 WL 3518527, at *30 (E.D.N.Y. July 20, 2018), *aff'd and remanded on reh'g sub nom. New York ex rel. James v. Griepp*, 11 F.4th 174 (2d Cir. 2021). After analyzing both *McCullen* and *Reed*, the district rejected the defendants' argument and concluded that "*Weslin* is a controlling precedent that neither the Second Circuit nor the Supreme Court has overruled or undermined." *Id.* at *31. On appeal, the Second Circuit agreed, stating that its "precedent directly rejects

Defendants' contention" and the FACE Act remains "facially neutral and constitutional." *New York ex rel. James v. Griepp*, 991 F.3d 81, 128 (2d Cir. 2021), *vacated on other grounds*, 11 F.4th 174.  That the Second Court later vacated its opinion on other grounds does not diminish its reasoning or that of the district court.  *See In re Motors Liquidation Co.*, 829 F.3d 135, 155 n.23 (2d Cir. 2016) (noting that a case that "was vacated on grounds of mootness" nonetheless "constitute[d] persuasive authority").

Accordingly, the Court rejects Defendants' argument that the FACE Act is an impermissible content-based regulation of speech, and it denies Defendant's motion on this ground.

## IV. The RFRA and Free Exercise Clause

Finally, Defendants argue that the Indictment violates both the RFRA and their free exercise of religion under the First Amendment.  *See* Br. at 22-25.  The Court addresses these arguments in turn.

### A.  The RFRA

The RFRA provides that the Government may not "substantially burden a person's exercise of religion" unless it "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that . . . interest."  42 U.S.C. § 2000bb-1.  Applying this standard, courts require the defendant to "first demonstrate that the government (1) substantially burdened (2) a sincere (3) exercise of religion."  *United States v. Manneh*, 645 F. Supp. 2d 98, 107 (E.D.N.Y. 2008) (citing 42 U.S.C. § 2000bb-1(a), (c)).  Then, "[i]f the defendant satisfies her *prima facie* case, . . . the burden shifts to the government to demonstrate that the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that government interest.'"  *Id.* (citing 42 U.S.C. § 2000bb-1(b)).

Here, there is no basis to find that the Government's prosecution has substantially burdened Defendants' exercise of religion. *See* 42 U.S.C. § 2000bb-1. Defendants state that their "pro-life praying, singing, Bible reading, and counseling is religiously motivated." Br. at 23. Even if that is true, the Indictment does not charge them for these religious activities. Instead, the Government has accused Defendants of engaging, and conspiring to engage in, the use of force, threats of force, and physical obstruction. *See* Indictment ¶ 2; Opp. at 21. As alleged in the Indictment, Defendants blocked access to reproductive health services, used force on patients and providers, and made threats. Indictment ¶¶ 4, 5, 8. Such threats and physical force are a far cry from "pro-life praying, singing, Bible reading, and counseling." Br. at 23.

Even if the Government's enforcement of the FACE Act substantially burdened Defendants' religious exercise, it is sufficiently justified and narrowly tailored. *See* 42 U.S.C. § 2000bb-1. The Government has compelling interests in preventing violence, preventing physical obstruction to health-care facilities, and preserving physical access to health care; and the FACE Act's restriction on the use of force, threats of force, and obstruction is narrowly tailored to serve those interests. *See Am. Life League*, 47 F.3d at 656 (concluding that the FACE Act is narrowly tailored to the government's compelling interests in "protect[ing] public health by promoting unobstructed access to reproductive health facilities" and "protect[ing] public safety by proscribing all violent, threatening or obstructive conduct specifically aimed at patients and providers of reproductive health services"); *cf. Weslin*, 156 F.3d at 298 (concluding that the FACE Act is narrowly tailored to serve compelling interests for purposes of a free-speech challenge).

Courts have consistently held, as this Court does, that application of the FACE Act does not violate the RFRA. *See Gallagher*, 2023 WL 4317264, at *12 ("As with the defendants' First

Amendment arguments, the question of how that rule applies to the FACE Act is not new.

Numerous courts have considered it and have concluded that the FACE Act is compatible with

RFRA"); *see, e.g.*, *United States v. Weslin*, 964 F. Supp. 83, 87-88 (W.D.N.Y. 1997) ("FACE is

not in conflict with [the] RFRA."), *aff'd*, 156 F.3d 292 (2d Cir. 1998); *Am. Life League*, 47 F.3d

at 656 ("We conclude that the [FACE] Act serves sufficiently compelling government interests

by the least restrictive means available.  It therefore does not violate RFRA."); *Cheffer*, 55 F.3d

at 1522 (holding "that the [FACE] Act survives appellants' challenge under the RFRA"); *United*

*States v. Dinwiddie*, 885 F. Supp. 1286, 1289 (W.D. Mo. 1995), *aff'd and remanded*, 76 F.3d

913 (8th Cir. 1996); *United States v. Brock*, 863 F. Supp. 851, 866 (E.D. Wis. 1994) ("FACE

does not violate RFRA."), *aff'd sub nom. United States v. Soderna*, 82 F.3d 1370 (7th Cir. 1996);

*Houck*, 2023 WL 144117, at *4 (concluding that "the enforcement of [the FACE Act] does not

burden [the defendant's] exercise of religion").

Accordingly, because Defendants' prosecution under the FACE Act does not violate the

RFRA, Defendants' motion to dismiss on this ground is denied.

### B.  The Free Exercise Clause

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the

free exercise" of religion.  U.S. Const. amend. I.  "It is well established that a generally

applicable law that does not target religious practices does not violate the Free Exercise Clause."

*Universal Church v. Geltzer*, 463 F.3d 218, 227 (2d Cir. 2006).  Thus, "a neutral law of general

applicability does not violate the Free Exercise Clause simply because the law imposes an

incidental burden on a religious practice."  *United States v. Amer*, 110 F.3d 873, 879 (2d Cir.

1997).

Defendants argue that the FACE Act is not generally applicable "given the Government's

radically lopsided enforcement."  Br. at 24.  However, the Court has already rejected that factual

premise as unsupported.  *See supra* Discussion § I.  Additionally, the reproductive health provisions of the FACE Act are generally applicable and contain no religious component.  *See Cheffer*, 55 F.3d at 1522 (noting that the FACE Act "leaves ample avenues open for appellants to express their deeply-held belief so long as this expression does not involve physical force, threats of such force, or physical obstruction"); *Am. Life League, Inc.*, 47 F.3d at 654 (deeming the FACE Act "neutral toward religion"); *cf. Weslin*, 156 F.3d at 297 ("It contains no requirement whatsoever that the offenders intend to communicate a particular message – or any message at all – by their obstructive actions.").  Accordingly, Defendants' motion to dismiss the Indictment under the Free Exercise Clause is denied.

## CONCLUSION

For all of these reasons, Defendants' motion to dismiss is DENIED.  The Clerk of Court is respectfully directed to terminate the motion at ECF No. 55.

Dated: November 8, 2023
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge