UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                                                   22 CR. 684 (JLR)

    -against-


BEVELYN WILLIAMS,

                Defendant,
------------------------------------------------------------X

TO:    THE HONORABLE JENNIFER L. ROCHON


## DEFENDANT'S SENTENCING MEMORANDUM


                                                                                         Calvin H. Scholar
                                                                                        *Attorney for Bevelyn Williams*
                                                                                        The C.H. Scholar Law Firm, P.L.L.C.
                                                                                       225 Broadway, Suite 715
                                                                                        New York, New York 10007
                                                                                        Telephone: (212) 323-6922
                                                                                        Facsimile: (212) 323-6923


                                                                                        July 10, 2024

"Children raised in chaos become adults who live in chaos."  This quote emphasizes the profound impact of Adverse Childhood Experiences (ACEs) on adult outcomes. When children grow up in chaotic environments characterized by instability, conflict, and unpredictability, it can shape their emotional development and behavior well into adulthood.  Bevelyn Williams knows all too well the impact that instability, chaos and uncertainty have on a child.  She grew up in an environment that can only be described as volatile and unfortunately, as she grew up, found herself repeating similar patterns of behavior that were all too familiar from her own childhood.  Then, one day, she found the Catholic Church and a ministry which provided her with the love, stability, and comfort she had been longing for since she was a child.  However, her unresolved trauma coupled with the intense emotions she found in her faith, led her to act in an impulsive and distracted manner which resulted in her involvement in the instant offense.

      The defense submits that the challenge of Ms. Williams' case is to mete out a sentence that is sufficient, but not greater than necessary to satisfy the ends of justice.  The defense would urge this Court, after considering Ms. Williams' unique history and characteristics, to impose a sentence probation or home confinement.

## **Background**



---

[1] *See* Presentence Investigation Report (hereinafter "PSR") ¶ 76.
[2] *See* Mitigation Report (hereinafter "MR") at p. 2.
[3] MR at p. 4.
[4] *Id*.
[5] *Id*.
[6] *Id*.
[7] *Id.; see also* MR at p. 2.
[8] MR at p. 3.
[9] MR at p. 2.



---

[10] ▬▬ at p. 5.
[11] MR. at p. 4.
[12] *Id*; PSR ¶ 80.
[13] MR at p. 4.
[14] MR. at p. 5.
[15] *Id*; PSR ¶ 80.
[16] MR at p. 5.
[17] *Id*.
[18] PSR ¶ 81.
[19] MR at p. 6-7.
[20] MR at p. 5.
[21] *Id*.
[22] *Id*; PSR ¶ 80.
[23] MR at p. 5.

The instability and anxiety she felt while living with her mother seemed to fade away when she moved in with her father. She felt more secure, better provided for, and loved.[24]

Three years later, Ms. Williams and her siblings returned to live with their mother and they were reintroduced to a chaotic and abusive home environment.[25] Not only was her mother physically and emotionally abusive, engaged in illegal activities, and more focused on herself than her children, she also moved around a lot which made it difficult for Ms. Williams to ever feel settled and only added to the instability in the home.[26] There was also no supervision when Ms. Williams lived with her mother. Because her mother was too distracted by her own life, she never paid attention to the needs of her children which often left them to fend for themselves.[27] Living with her mother had "taken on the pattern of a recurring nightmare with no escape from the chaos and conflict."[28]

The constant moving also resulted in Ms. Williams always having to start over at a new school with new friends and a new environment. Between sixth and eighth grade, Ms. Williams had moved twice. Following her mother's separation from her second husband, the family moved from Denver, North Carolina to Gastonia, North Carolina.[29] Moving to Gastonia was a culture shock for Ms. Williams because she and her siblings were the only black kids there and the challenges she faced were overwhelming.[30] Not only was Ms. Williams dealing with the difficulties of a new school, but she continued to suffer from physical and emotional abuse and neglect at home with her mother and the lack of a healthy mother-daughter relationship made it that much harder to cope with the movements to various places and schools.[31]

After another incident occurred with Ms. Williams' mother, the family moved back to Charlotte, which was yet another shock for Ms. Williams. However, she began attending a new high school that felt like an improvement from her previous school. Additionally, her mother got a job at the same school and Ms. Williams felt like their relationship was starting to improve.[32] They were spending more time together outside of the home and Ms. Williams felt that her mother had a better temperament at school.[33] She was hopeful that her mother's positive attitude at school would translate to improvements at home; however, she quickly became disillusioned when the conflict at home remained the same.[34] After her mother lost the job at the school for failing to disclose a felony conviction, things only continued to deteriorate. The family had to move to a more affordable part of Charlotte and Ms. Williams had to once again, transfer schools.[35]

---

[24] MR at p. 5-6.
[25] MR at p. 6.
[26] *Id*.
[27] *Id*.
[28] *Id*.
[29] MR at p. 7.
[30] *Id*.
[31] *Id*.
[32] *Id*.
[33] *Id*.
[34] MR at p. 7-8.
[35] MR at p. 8.

[redacted]

---

[36] *Id*.
[37] *Id*.
[38] *Id*.
[39] *Id*.
[40] MR at p. 9.
[41] *Id*.
[42] *Id*.
[43] *Id*.
[44] *Id*.
[45] *Id*.
[46] *Id*.
[47] MR at p. 9-10.
[48] MR at p. 10.
[49] *Id*.
[50] *Id*.



---

[51] *Id*.
[52] *Id*.
[53] MR at p. 11.
[54] *Id*.
[55] *Id*.
[56] PSR ¶ 68.
[57] MR at p. 11.
[58] *Id*.
[59] MR at p. 11-12.
[60] MR at p. 12.
[61] *Id*.
[62] *Id*.
[63] *Id*.
[64] PSR ¶ 87.
[65] *Id*.
[66] *Id*.; MR at p. 12.
[67] MR at p. 12.



Throughout this time she was working, Ms. Williams was also involved in the Christian ministry and in 2014, she, along with others, started a nonprofit, At the Well Ministries, a 501(c)(3) foundation.[81]

In 2018, while working and living in Maine, Ms. Williams saw an opportunity to serve her community by running for elected office.[82] Unfortunately, she had to drop her candidacy because

---

[68] *Id*.
[69] MR at p. 12-13.
[70] MR at p. 13.
[71] *Id*.
[72] *Id*.
[73] PSR ¶ 108.
[74] *Id*.
[75] MR at p. 13.
[76] *Id*.
[77] PSR ¶ 118.
[78] PSR ¶ 117.
[79] PSR ¶ 116.
[80] PSR ¶ 115.
[81] PSR ¶ 113.
[82] MR at p. 14.

she had a past felony record.[83] This was difficult for Ms. Williams – she felt like she was finally moving forward but this setback reminded her of her past and she again felt rejected and out of place. She decided to move back to Staten Island with her father in 2018 and within a few months, he died of congestive heart failure.[84] Ms. Williams was devastated by the loss of her father and found comfort in the ministry and the friends she had made there. After the death of her father in 2019, Ms. Williams was reflecting on her childhood and was reminded of the anti-abortion protest she had witnessed when she was 15 years old.[85] She was overwhelmed with grief which was aggravated by feelings of guilty over her past decisions including her history of abortions.[86] Notably, it was at this time that Ms. Williams began clinging to her religious faith and other likeminded individuals and began protesting at abortion clinics.[87]

Around the time she began protesting, Ms. Williams met Ricky Williams on Facebook.[88] The two connected and they met in person on February 5, 2021.[89] Just a few months later, the two married in Tennessee and in 2022, they had a daughter, ▮▮▮▮▮▮▮▮▮▮.[90] Mr. Williams is a supportive and loving husband and father and Ms. Williams feels lucky to have found such a great partner. The best moment of Ms. Williams' life was the birth of her daughter and she is determined to be a good mother, learning from the mistakes of her own mother and vowing to never make her own daughter feel the way her mother made her feel.[91] Her "love, dedication, and protectiveness is evident when you observe Bevelyn as a parent."[92]

Despite the hardships that Ms. Williams endured throughout her childhood and young adult life, she has learned how to love and trust again with the help of her ministry. She has made immense growth over the years as a person and "desire[s] to make better and sound decisions" in her life.[93] The common theme in the numerous letters of support on behalf of Ms. Williams is that she is always looking to help those who are less fortunate. She "changed the trajectory of life for herself" and wants to show others that they can bring themselves out of their hardship and be productive, important members of society.[94] She "continually challenges people to get involved in their local government, school boards, planning boards, [as] elected officials, etc." and continues to grow and evolve herself so that she can better serve those around her.[95] Whenever she can she participates in community outreach events and mentors young women.[96] Ms. Williams is a "highly

---

[83] *Id*.
[84] *Id*.
[85] *Id*.
[86] *Id*.
[87] *Id*.
[88] MR at p. 15.
[89] *Id*.
[90] PSR ¶ 88.
[91] MR at p. 15.
[92] Exhibit B – Letter from Wendy Roberts.
[93] Exhibit C – Letter from Taysha Heard.
[94] Exhibit B– Letter from Wendy Roberts.
[95] Exhibit D – Letter from Cheryl Ryan.
[96] *See* Exhibit E – Letter from Angel Gomez.

intelligent, courageous [and] passionate"[97] individual who is needed in her home, her community, and by all those who know her.[98]

## THE APPROPRIATE SENTENCE

Family Ties and Responsibilities



The application notes associated with U.S.S.G. §5H1.6 indicate that a sentence below the applicable guideline range may be granted, but only if family ties and responsibilities are present to an extraordinary degree. The Second Circuit has been progressive in the use and application of U.S.S.G. § 5H1.6 to grant sentences below the applicable guideline range. *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (affirming a 13 level downward departure to a single mother with four children, including one child who was institutionalized); *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) (upholding a 13 level downward departure), *United States v. Greene*, 249 F. Supp.2d 262 (2d Cir. 2003) (defendant had devoted his life to parenting very disturbed and hard-to-place orphaned children, and had adopted six underprivileged boys, three of whom remained dependent on defendant as their sole financial and emotional support); *United States v. White*, 301 F.Supp.2d 289 (2d Cir. 2004) (downward departure from offense level 25 to offense level 17, on basis of extraordinary family circumstances, was appropriate).

The Court in *United States v. Ekhator*, 17 F.3d 53 (2d Cir. 1994), remanded the case to the District Court for further consideration as to whether a departure should be granted to a mother with five children. The Court held that the District Court could grant a departure *sua sponte* even in a case in which the defendant had entered into a plea agreement that did not allow her to seek a departure at sentencing. *Id*.

In *United States v. Mateo*, 299 F.Supp.2d 201 (S.D.N.Y. 2004), Judge Marrero granted a 9-level downward departure based upon extraordinary family circumstances due to the fact that there were two young children who were thrust into the lives of relatives who were reporting difficulty

---

[97] Exhibit F – Letter from Marsha Elliot.
[98] *See* Exhibit G – Letter rom Edmee Chavannes; *see also* Exhibit H – Letter from David Benhham; Exhibit I – Letter from Daniesha Alvarez.

in raising the children. Other District Courts within the Second Circuit have also granted a sentence below the advisory guidelines when presented with family ties and responsibilities that were present to an extraordinary degree. *United Sates v. Gerard*, 782 F.Supp. 913, 914-15 (S.D.N.Y. 1992); *United States v. Pokuaa*, 782 F.Supp. 747 (E.D.N.Y. 1992); *United States v. Handy*, 752 F.Supp. 561, 564 (E.D.N.Y. 1990); *United States v. Mills*, 88 Cr. 956 (CSH), 89 Cr. 256 (CSH), 1990 WL 8081 (S.D.N.Y. Jan. 17, 1990); *United States v. Gonzalez*, 88 Cr. 559 (CSH), 1989 WL 59613 (S.D.N.Y. July 27, 1989).

The defense does not suggest that the instant charges are not serious. Similarly, the defense does not propose that Ms. Williams' family circumstances should merit greater consideration than the instant conviction. However, the defense submits that 18 U.S.C. § 3553 authorizes the Court to consider all factors not prohibited by law in order to craft a just and fair sentence.



In *United States v. Milikowsky*, 65 F.3d 4, 7 (2d Cir. 1995) the Court stated,

> "[a]mong the permissible justifications for downward departure, we have held, is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third **parties**. Although a Guidelines policy statement indicates that '[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the guidelines,' U.S.S.G. § 5H1.6 (policy statement), we have nonetheless held that, where a defendant's parental responsibilities were 'extraordinary' and incarceration would 'wreak extraordinary destruction' on her four young dependents, downward departure to avoid imprisonment was warranted."

In *United States v. Johnson*, 964 F.2d 124, 129-130 (2d Cir. 1992), the Court quoted Judge Patterson's sentencing decision:

> "[t]he rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability,

>but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing. In view of the special circumstances of the defendant-I shouldn't say "defendant," I should say of the "defendant's family," which, as the court sees it, is a family in which the mother is the sole link between the children, the six-month old child ... and having the father …who does not contribute to the support of the five- and six-year-old children, ... a 17-year-old boy having a father who does not contribute to his support, and a six-year-old grandchild whom the mother is unable to keep because of the circumstances of her having another child, at the age of 21, and living in an institution ... I'm going to reduce the level.
>
>A week later, at [the co-defendant's] sentencing, the court explained the Johnson departure: 'I did feel that those children being without a mother for an extended period of time was a hardship on them, not on her, hardship on them, and that was extraordinary grounds for a departure.'"

As the Court stated, "Judge Patterson made it clear that the departure was not on behalf of the defendant herself, but on behalf of her family." *Id*. The goal as stated in *Johnson* is not to decrease culpability. *Id*. Rather, the purpose is to provide a child with necessary emotional support within enough time for some good to still be accomplished.

Finally, the defense argues for a sentence below the applicable guideline range because the guidelines historically have had a detrimental effect on women, particularly in the application of §5H1.6 which the Commission has not yet resolved or considered.[99] In her article, Judge Gertner relied on studies that demonstrated that the overwhelming majority of women offenders in the Federal system were single mothers.[100] The bulk of caretaking responsibility falls on women in society and therefore, they are likely to be more affected by prison sentences. Similarly, prison sentences imposed on single mothers have more impact on children who typically rely on the mother for emotional needs. Judge Gertner theorized that because female offenders were often mothers, their circumstances may not meet the standard of being extraordinary as it was a routine occurrence to encounter female offenders who were mothers.[101]

However, due to the fact that women are still a minority of Federal criminal defendants, their circumstances within the Federal sentencing system cannot be considered "ordinary."[102] As a result, women are disproportionately affected by the wording of the guideline as §5H1.6 instructs that family circumstances are not ordinarily relevant.

---

[99] Hon. Nancy Gertner, *Women Offenders and the Sentencing Guidelines*, 14 Yale J.L. & Feminism, 291 (2002).
[100] *Id*. at 297.
[101] *Id*. at 290.
[102] *Id*.

Further, there is support for the theory that prior to the guidelines being enacted, family circumstances were considered and judges imposed shorter sentences on mothers. In her article, Myrna S. Raeder posits that

> "while all defendants receive longer sentences under the Guidelines than previously, women's sentences have increased more than those of men because before the guidelines they received probation and shorter sentences more often than men. For example, it appears that the sentence ranges established by the Guidelines were created in part by determining average sentences for defendants committing selected crimes. However, blending male and female statistics benefitted men and disadvantaged women, because men previously received longer sentences than those given to women…it is obvious that the Commission did not think about gender issues in formulating the guideline ranges." [103]

Raeder had also found that

> "Black and Hispanic women are being sentenced to federal prison more than White women. In 1991, forty-eight percent of White females received a prison sentence, compared to fifty-six percent of Black females and sixty-nine percent of Hispanic females. This pattern repeated in 1992. This apparently skewed effect may simply be a function of offense characteristics. It is likely that minority women are overly represented in drug offenses subject to severe mandatory minimum sentences. However, it raises the specter of a criminal justice system which penalizes the illegal activities of its minorities more severely than those of its White population. Similarly, different racial and gender patterns are emerging for downward departures. In fiscal years 1991 and 1992, Black men and women received a lower percentage of downward departures for reasons other than substantial assistance than did any other grouping of sentenced individuals. Again, there is no obvious reason for the discrepancy, yet it is troubling that unless prosecutors request a substantial assistance departure, Black offenders are less likely than others to receive downward departures."[104]

This startling fact remains true more than 30 years after Ms. Raeder wrote her article. On November 14, 2023, the Sentencing Commission released a report about the demographic differences in Federal sentencing which examined federal sentencing practices in the five fiscal years since the last report released in 2017.[105] The Commission reviewed and "refined the

---

[103] Myrna S. Raeder, *Gender and Sentencing: Single Moms, Battered Women, and Other Sex-Based Anomalies in the Gender-Free World of the Federal Sentencing Guidelines*, 20 Pepp. L. Rev. 905, 926 (1993).
[104] *Id*. at 928-29 (citations omitted).
[105] *See Demographic Differences in Federal Sentencing*, United States Sentencing Commission, November 2023.

analytical methods used in previous reports to better understand sentencing disparity in the federal courts."[106]

The Commission found:

## Key Findings

Consistent with its previous reports, the Commission found, after controlling for available personal and offense characteristics, that there continue to be differences in sentence length when comparing demographic groups of individuals sentenced for a federal offense.

**1** Sentencing differences continued to exist across demographic groups when examining all sentences imposed during the five-year study period (fiscal years 2017-2021). These disparities were observed across demographic groups—both among males and females.

Specifically, Black males received sentences 13.4 percent longer, and Hispanic males received sentences 11.2 percent longer, than White males.

Hispanic females received sentences 27.8 percent longer than White females, while Other race females received sentences 10.0 percent shorter.

**2** The sentencing differences in the data the Commission examined largely can be attributed to the initial decision of whether the sentence should include incarceration at all rather than to the length of the prison term once a decision to impose one has been made. In particular, the likelihood of receiving a probationary sentence varied substantially by gender and race.

Black males were 23.4 percent less likely, and Hispanic males were 26.6 percent less likely, to receive a probationary sentence compared to White males.

Similar trends were observed among females, with Black and Hispanic females less likely to receive a probation sentence than White females (11.2% percent less likely and 29.7% less likely, respectively).

The Commission ultimately found that even when controlling for available personal and offense characteristics, Black males and females continued to receive longer sentences.[107] The

---

[106] *Id*. at 2.
[107] *Id*. at 5.

defense submits that the Commission has not appropriately considered that the "legislative equality" of the guidelines doubly and negatively impacted African-American women such as Ms. Williams.

The Defense Disagrees with the Probation Department's Assessment

The heavy-handed approach to women of color in the criminal justice system is most apparent in the conclusions and sentence recommendation of the Department of Probation's Pre-Sentencing Report.[108] There is no desire to minimize the instant conviction by the defense, but the Probation Department's description of the instant case as a "felonious assault" with a "dangerous weapon" is just plain wrong. The defense strenuously objects to the use Probation Department's approach in reaching a base offense level of 14 and an adjusted offense level of 19.

The defense submits that the appropriate offense level based upon the jury verdict would be 6 pursuant to §2H1.1(a)(4) or at the most 10 pursuant to §2H1.1(a)(3)(A). The defense also objects to an adjustment for role. Ms. Williams was not a leader or organizer of the protest. The trial testimony and evidence supported the conclusion that several groups of protesters came together and each person acted separately. Ms. Williams was loud, but the contention that she was a leader or organizer was clearly rejected by the jury. In addition, the fact that a person plays an important role does not, in and of itself, require an aggravating role adjustment. *See United States v. Sostre*, 967 F.2d 728, 733-34 (1st Cir. 1992). Similarly, a strong personality is not sufficient to support a role increase. *See United States v. Jordan*, 291 F. 3d 1091, 1098-99 (9th Cir. 2002) (reversing district Court's four level increase).

Finally, in its 2023 report on demographics, the Commission failed to determine a reason for the disparity which caused women of color to be 30% less likely to be sentenced to probation than white women. Ms. Raeder's article which tackled the disparity in sentencing for women of color under the Guidelines was published 30 years ago and the Commission has been studying the disparity for at least 7 years formally. Unfortunately, the Commission concluded that more time was needed to study the cause of such disparity.

Lack of Mental Health Treatment in BOP Facilities

The United States Department of Justice, Bureau of Justice Statistics, published a report titled "Mental Health Problems of Prison and Jail Inmates" in 2006 and it is the only report on this topic. The report is available at www.ojp.usdoj.gov/bjs/pub/pdf/mhppji.pdf [hereafter DOJ Report] annexed hereto as Exhibit B.[109] Tables 3 and 4 of the DOJ Report support the conclusion that inmates with poor emotional or mental health will not get counseling while incarcerated. Table 3 sets forth that 43.6% of male inmates and 61.2% of women inmates in Federal prison have a mental health problem.

---

[108108] *See* PSR ¶46.
[109] Doris James and Lauren Glaze "Mental Health Problems of Prison and Jail Inmates" Office of Justice Programs, Bureau of Justice Statistics, September 2006 Table 3, p. 4.

| Table 3. Prison and jail inmates who had a mental health problem, by selected characteristics | | | |
|---|---|---|---|
| | Percent of inmates in — | | |
| Characteristic | State prison | Federal prison | Local jail |
| All inmates | 56.2% | 44.8% | 64.2% |
| **Gender** | | | |
| Male | 55.0% | 43.6% | 62.8% |
| Female | 73.1 | 61.2 | 75.4 |
| **Race** | | | |
| White[a] | 62.2% | 49.6% | 71.2% |
| Black[a] | 54.7 | 45.9 | 63.4 |
| Hispanic | 46.3 | 36.8 | 50.7 |
| Other[a,b] | 61.9 | 50.3 | 69.5 |
| **Age** | | | |
| 24 or younger | 62.6% | 57.8% | 70.3% |
| 25-34 | 57.9 | 48.2 | 64.8 |
| 35-44 | 55.9 | 40.1 | 62.0 |
| 45-54 | 51.3 | 41.6 | 52.5 |
| 55 or older | 39.6 | 36.1 | 52.4 |

[a]Excludes persons of Hispanic origin.
[b]Includes American Indians, Alaska Natives, Asians, Native Hawaiians, other Pacific Islanders, and inmates who specified more than one race.

However, Table 14 sets forth that only 24% of prisoners in Federal jails "received treatment after admission" and only 15.1% had "professional mental health therapy."[110]

| Table 14. Mental health treatment received by inmates who had a mental health problem | | | |
|---|---|---|---|
| | Percent of inmates who had a mental problem in — | | |
| Type of mental health treatment | State prison | Federal prison | Local jails |
| **Ever received mental health treatment** | 49.3% | 35.3% | 42.7% |
| Had overnight hospital stay | 20.0 | 9.5 | 18.0 |
| Used prescribed medications | 39.5 | 28.0 | 32.7 |
| Had professional mental health therapy | 35.4 | 25.6 | 31.1 |
| **Received treatment during year before arrest** | 22.3% | 14.9% | 22.6% |
| Had overnight hospital stay | 5.8 | 3.2 | 6.6 |
| Used prescribed medications | 15.8 | 10.1 | 16.9 |
| On prescribed medication at time of arrest | 11.3 | 7.3 | 12.3 |
| Had professional mental health therapy | 11.5 | 8.0 | 12.3 |
| **Received treatment after admission** | 33.8% | 24.0% | 17.5% |
| Had overnight hospital stay | 5.4 | 2.7 | 2.2 |
| Used prescribed medications | 26.8 | 19.5 | 14.8 |
| Had professional mental health therapy | 22.6 | 15.1 | 7.3 |

Note: Excludes other mental health treatment.

Many BOP facilities only have a few psychologists on staff and therefore, each prison psychologist's caseload may number in the hundreds. Further, there is no support for a conclusion

---

[110] Doris James and Lauren Glaze "Mental Health Problems of Prison and Jail Inmates" Office of Justice Programs, Bureau of Justice Statistics, September 2006 Table 3, p. 9.

that an inmate would be able to form a therapeutic bond with a counselor or that the inmate would be held in a facility long enough for such a bond to develop.

<u>Statistics Show that Longer Prison Sentences do not Affect General or Specific Deterrence</u>

Studies show the "criminogenic" effect prison has--imprisonment can actually lead people to commit more crimes after release.[111] Prisons provide little rehabilitative programming and often release individuals back to society without proper support, which leaves them vulnerable and likely to turn back to crime.[112] A 2007 National Bureau of Economic Research study found that "prison stays longer than 20 months had 'close to no effect' on reducing commission of certain crimes upon release."[113] Additionally, a 2013 paper by economist David Abrams found that longer sentences do not reduce recidivism more than shorter sentences.[114] Abrams examined the effects of sentencing and parole in three cities (Chicago, Las Vegas, and Washington, D.C.) and two states (California and Georgia) and concluded that "these studies seem to find fairly consistent evidence of specific deterrence for low sentences ranges, but not for longer ones."[115]

An analysis of over 440,000 prisoners by psychologist Paul Gendreau in 2002 also found significant diminishing returns for longer prison sentences and he concluded that after twelve (12) months, prison stays caused higher recidivism.[116]

Similarly, studies indicate that long prison sentences have little to no impact on reducing the criminal behavior of the public at large, commonly known as "general deterrence."[117] A study by the National Academy of Sciences in 2014 conducted a comprehensive analysis of more than a dozen leading studies on general deterrence and concluded that "the evidence on the deterrent effect of sentence length suggests that the relationship between crime rate and sentence length [has] diminishing deterrent returns" at best.[118] Proponents of longer prison sentences claim that

---

[111] *How Many Americans are Unnecessarily Incarcerated?*, 29 FED. SENT. R. at 141 (December 1, 2016-February 1, 2017).
[112] *Id*.
[113] *How Many Americans are Unnecessarily Incarcerated?*, 29 FED. SENT. R. 140, 141 (December 1, 2016 – February 1, 2017); citing Ilyana Kuziemko, *Going off Parole: How the Elimination of Discretionary Prison Release Affects the Social Cost of Crime* 21 (Nat'l Bureau of Econ Research, Working Paper No. 13380, 2007), http://www.nber.org/papers/w13380.
[114] *Id*. at 154; David Abrams, *The Imprisoner's Dilemma: A Cost Benefit Approach to Incarceration*, 98 IOWA L.J. 907 (2013).
[115] Abrams, 98 IOWA L. J. at 936.
[116] 29 FED.SENT. R. at 155; Paul Gendreau et al., The Effect of Prison Sentences & Intermediate Sanctions on Recidivism: General Effects & Individual Differences (2002), http://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ffcts-prsn-sntncs/index-eng.aspx.
[117] 29 FED. SENT. R. at 156.
[118] Jeremy Travis et al., Nat'l Research Council, The Growth of Incarceration in the United States: Exploring Causes and Consequences 139, 154 (2014).  *See also*, Daniel S. Nagin, *Deterrence in the Twenty-first Century: A Review of the Evidence*, 42 Crime and Justice: Crime and Justice in America 1975-2025 199, 231 (2013).  *See* Daniel P. Mears, et al., *Recidivism and Time Served in Prison*, 106 J. CRIM. L. & CRIMINOLOGY 81, 82-3 (2016); *see* Edward J. Latessa, et al., WHAT WORKS (AND DOESN'T) IN REDUCING RECIDIVISM, 6-7 (2014) (describing the changes in the corrections system and longer terms of incarceration).

additional time in prison exacts greater retribution and creates deterrent effects, including a specific deterrent effect that reduces recidivism.[119] However, it is unclear exactly how specific deterrent effects of prison may unfold over varying periods of incarceration.[120] Studies have found that "when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism."[121]

"[L]onger prison sentences were associated with a **three percent increase** in recidivism. Offenders who spent an average of 30 months in prison had a recidivism rate of 29%, compared to a 26% rate among prisoners serving an average sentence of 12.9 months."[122] When prison sentences are relatively short, the offender is more likely to maintain ties to their family, employers, and community which all promote successful reentry into society.[123]

The "pains or strains of imprisonment, which could contribute to deterrent effects, may be more concentrated in or felt more acutely during early stages than later stages of incarceration."[124] Notably, longer prison sentences "may allow for greater acclimation to prison culture and so a greater likelihood of offending after release to society."[125] Additionally, despite the marked increase in incarceration in recent decades, "there is no evidence that recidivism rates have improved."[126]

"Data show that ex-prisoners struggle in the labor market after their period of incarceration. In the first full calendar year after their release, only 55 percent have any reported earnings. Among those with jobs, their median annual earnings is $10,090 and only 20 percent earn more than $15,000 that year—an amount roughly equivalent to the earnings of a full-time worker at the federal minimum wage. Overall, the outcomes of ex-prisoners are poor despite the fact that the vast majority appear eligible for tax incentives that promote employment for low-income workers, including provisions that specifically target ex-felons."[127] "Research suggests the mark of a

---

[119] Mears, et al., 106 J. CRIM. L. & CRIMINOLOGY at 83.
[120] *Id*; *see also* David S. Abrams, *How do we decide how long to incarcerate*?, in EMPIRICAL LEGAL ANALYSIS: ASSESSING THE PERFORMANCE OF LEGAL INSTITUTIONS, (Yun-chien Chang ed., 2014); Joshua C. Cochran et al., *Assessing the Effectiveness of Correctional Sanctions*, 30 J. QUANTITATIVE CRIMINOLOGY 317, 318 (2014) (reviewing prior literature on the uncertain effects of variable amounts of time served in prison); Thomas Orsagh & Jong Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. QUANTITATIVE CRIMINOLOGY 155 (1988) (describing the time served-recidivism relationship).
[121] Thomas Orsagh & Jong-Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. QUANTITATIVE CRIMINOLOGY 155 (1988).
[122] Valerie Wright, Ph.D, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT 6 (2010), https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.
[123] *Id*. at 7.
[124] Mears, et al., 106 J. CRIM. L. & CRIMINOLOGY at 83.
[125] *Id*. at 84.
[126] *Id*. at 86.
[127] Looney, Adam and Turner, Nicholas (2018) "*Work and Opportunity Before and After Incarceration*," Economic Studies at Brookings, The Brookings Institute, at 1.

criminal record imposes impediments to employment, exacerbating economic disparities and contributing to recidivism."[128] In fact, studies show that "each additional year of incarceration reduces earnings by as much as 12 percent and that future earnings growth can be as much as 30 percent lower."[129]

Additional studies found that "resumes with prison records are far less likely (roughly 50 percent) to get a response from employers relative to comparable resumes without a record."[130] "After leaving prison, ex-felons have poor employment outcomes, low earnings when working, and little attachment to the formal sector."[131] The Brookings Institute ultimately discovered that "[i]n the first full year after release…about 49 percent of ex-prisoners earn less than $500—as reported on a W2 or tax return (on Schedule C) —32 percent earn between $500 and $15,000, and only 20 percent earn more than $15,000."[132] "Among those with earnings, the median ex-prisoner earns $10,090 and the average reported earned income is $13,890. By comparison, the employment-to-population ratio of individuals with less than a high school diploma was about 41 percent in 2014, their median weekly earnings, working full-time, was $488 (about $25,000 a year if working 50 weeks), and the median annual earnings for an individual with less than a high school degree was $19,492 (BLS 2014; U.S. Census Bureau, 2006-2010 American Community Survey)."[133]

---

[128] *Id*. at 1; see also Pager, Devah (2003) "*The Mark of a Criminal Record*," American Journal of Sociology 108(5), at p. 937–975; Mueller-Smith, Michael (2015) "*The Criminal and Labor Market Impacts of Incarceration*." Available at: https://sites.lsa.umich.edu/mgms/wp-content/uploads/sites/283/2015/09/incar.pdf).
[129] Looney, Adam and Turner, Nicholas (2018) "*Work and Opportunity Before and After Incarceration*," Economic Studies at Brookings, The Brookings Institute, at 4.
[130] *Id*. at p. 4.
[131] *Id*. at 7.
[132] *Id*.
[133] *Id*.

**CONCLUSION**

As set forth in 18 U.S.C. § 3582, "[t]he Court in determining whether to impose a term of imprisonment…shall consider the factors set forth in section 3553 (a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." And 28 U.S.C. § 994(k) which sets forth "[t]he Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment." Brittanica defines punishment as "the infliction of some kind of pain or loss upon a person." More suffering or pain should not be inflicted upon those who have already suffered so much. The defense strongly urges this Court to impose a sentence of probation or home confinement.

DATED:   New York, New York                                Respectfully submitted,
            July 10, 2024

                                                                              /s/ Calvin H. Scholar
                                                                           Attorney for Bevelyn Williams
                                                                           The C.H. Scholar Law Firm, P.L.L.C.
                                                                           225 Broadway, Suite 715
                                                                           New York, New York 10007

TO:   The Honorable Jennifer L. Rochon
         United States District Judge
         Southern District of New York
         500 Pearl Street
         New York, New York 10007

         AUSA Mitzi Steiner
         AUSA Emily Johnson
         One Saint Andrew's Plaza
         New York, New York 10007